UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOSEPH J. NELSON and MICHAEL WYCOFF, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 1:02-cv-0477-DFH-TAB |
| IPALCO ENTERPRISES, INC., EMPLOYEES' PENSION COMMITTEE for Employees' Thrift Plan of Indianapolis Power & Light Company, JOHN R. HODOWAL, RAMON L. HUMKE, BRYAN G. TABLER, MAX CALIFAR, STEVE J. PLUNKETT, and TOM A. STEINER, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Table of Contents*

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

I.      The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

II.     Thrift Plan History and the 1995 and 1997 Amendments . . . . . . . . . .  9

        A.      Investor Choices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        B.      Investor Education Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.      Plan Terms on Investment Choices . . . . . . . . . . . . . . . . . . . . . . . 15

III.    IPALCO in 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.    Exploration of a "Transforming Transaction" . . . . . . . . . . . . . . . . . . . . . . 25

V.    Negotiations with AES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VI.    After the Announcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VII.    Defendants' Evaluation of AES and IPALCO  . . . . . . . . . . . . . . . . . . . 41

VIII.    Plaintiffs' View of AES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

IX.    The Individual Defendants' Interests in the AES Deal  . . . . . . . . . . . . 52

        A.    Termination Benefit Agreements  . . . . . . . . . . . . . . . . . . . . . . . 53

        B.    Stock Sales by Defendants and Other IPALCO Insiders  . . . . . . 57

        C.    Disclosure of IPALCO Insider Transactions  . . . . . . . . . . . . . . 64

X.    Disclosures to Thrift Plan Participants  . . . . . . . . . . . . . . . . . . . . . . . . 68

XI.    Financial and Investment Advice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

        A.    The Country Club Advice Session for Executives  . . . . . . . . . . . 69

        B.    Merrill Lynch Advisers for Plaintiffs  . . . . . . . . . . . . . . . . . . . . 70

XII.    Pension Committee Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XIII.    The Closing and the Individual Defendants' Terminations . . . . . . . . . . 74

Conclusions of Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

I.    Fiduciary Duties Under ERISA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

II.    Allowing Plaintiffs to Invest in IPALCO and then AES  . . . . . . . . . . . 78

III.    Wrongful Promotion and a Duty to Disclose  . . . . . . . . . . . . . . . . . . . 92

IV.    Conversion of the Employer Match . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*Introduction*

The liability issues were tried to the court in this class action alleging breaches of fiduciary duty under Section 404 of the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104. The court now states its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. Substance rather than the court's label shall govern whether a matter is treated as a finding of fact or conclusion of law.[1]

Defendant IPALCO Enterprises, Inc. is the parent company of the Indianapolis Power and Light Company, a public utility that generates and distributes electricity in the Indianapolis area. The AES Corporation acquired IPALCO in a stock-for-stock transaction that closed on March 27, 2001. IPALCO became a wholly owned subsidiary of AES, and all IPALCO shareholders became shareholders of AES. In the year and a half that followed the March 27, 2001 closing, AES stock lost more than 90 percent of its market value. Ex. 89.

---

[1]The court previously denied defendants' motion to dismiss, *Nelson v. IPALCO Enterprises, Inc.*, 2003 WL 402253 (S.D. Ind. Feb. 13, 2003), granted certification of the plaintiff class, 2003 WL 23101792 (S.D. Ind. Sept. 30, 2003), and denied both sides' motions for summary judgment on liability and granted plaintiffs' motion for summary judgment on defendants' release defense, 2005 WL 1924332 (S.D. Ind. Aug. 11, 2005). In denying both sides' motions for summary judgment on the liability issues, the court noted that the law of ERISA fiduciary duty as applied to eligible individual account plans and their investments in employer stock was "emerging, controversial, and highly fact-sensitive." 2005 WL 1924332 at *3. The court has tried to provide detailed factual findings for the benefit of reviewing courts that might view the applicable law differently.

Plaintiffs are a class consisting of all plan participants and beneficiaries in a Section 401(k) plan known as the Employees' Thrift Plan of Indianapolis Power & Light Company who held a beneficial interest in IPALCO stock on or about March 27, 2001 that was exchanged for stock in The AES Corporation. The Thrift Plan itself is also a plaintiff. The Thrift Plan allowed participants to make their own decisions about how to invest their own contributions, though employer matching contributions were always made and held as IPALCO stock.

When the IPALCO–AES deal closed on March 27, 2001, the Thrift Plan held total assets of $228 million. Approximately $145 million, or about 64 percent of the Thrift Plan assets, was invested in IPALCO stock that was exchanged for AES stock. As AES stock value declined in the months after AES bought IPALCO, plaintiffs' accounts with the Thrift Plan experienced dramatic drops in value. Plaintiffs allege that the defendants – IPALCO itself and the former IPALCO executives who were responsible for the Thrift Plan before the AES deal closed – violated their fiduciary duties under ERISA by failing to remove IPALCO and then AES as investment options, by promoting continued investment in IPALCO and AES, by failing to disclose to Plan participants (more specifically than public disclosures required under federal securities laws) the individual defendants' personal sales of IPALCO stock, and by allowing the conversion of Plan assets from IPALCO stock to AES stock.

As explained below, the court finds that defendants did not breach their fiduciary duties under ERISA.  Without the benefit of hindsight, the AES transaction and investments in AES stock appeared reasonable, prudent, and consistent with the Thrift Plan itself at the time.  There is no evidence at all that the individual defendants had any negative inside information about AES or the prospects of its stock.  Defendants did not give investment advice themselves. They also made competent and appropriate investment advice readily available to Thrift Plan participants.  The individual defendants fully complied with their obligations under federal securities law to disclose their own sales of IPALCO stock and the risks associated with investments in AES.  ERISA did not require the defendants to make any additional and special disclosures only to the Thrift Plan participants.  Accordingly, the court is entering final judgment in favor of defendants.

*Findings of Fact*

I.    *The Parties*

In 2000, defendant IPALCO Enterprises, Inc. ("IPALCO") was a publicly traded holding company whose principal asset was its ownership of Indianapolis Power & Light Company, a public utility that generates and distributes electric power in the Indianapolis area.

In 1960, before the establishment of IPALCO as a holding company, Indianapolis Power & Light Company established the Employees' Thrift Plan of Indianapolis Power & Light Company ("the Thrift Plan" or "the Plan"). The Thrift Plan was designed to supplement the traditional defined-benefit retirement plan that the company operated. The Plan enabled employees to make voluntary investments. The employer matched employee contributions up to four percent of salary. The Plan was designed so that employer matches were always made in the form of stock in the company. Employees could choose how to invest their own contributions.[2] The Plan was treated as an Eligible Individual Account Plan ("EIAP") under ERISA, which allowed it to invest more than 10 percent of its assets in employer stock. See 29 U.S.C. § 1104(a)(2). The Plan fiduciaries and administrators did not make specific decisions about how to invest the employee contributions. The Plan administrator and IPALCO as the Plan sponsor selected the available menu options for employees' investment choices.

*The Pension Committee*: Indianapolis Power & Light Company has been the sponsor of the Thrift Plan. The named administrator of the Thrift Plan was the Employees' Pension Committee for Employees' Thrift Plan of Indianapolis Power & Light Company, known here as "the Pension Committee." During the time leading up to the March 27, 2001 closing of the AES deal, the Pension Committee members were the individual defendants in this case: IPALCO chief executive

---

[2]This summary simplifies some changes in the Thrift Plan over time. Changes that are relevant to this case are addressed in detail below.

officer John R. Hodowal, IPALCO chief operating officer Ramon L. Humke, Pension Committee chairman Bryan G. Tabler (also vice president, secretary, and general counsel), Max Califar (vice president of human resources), Stephen J. Plunkett (controller), and Tom A. Steiner (also a vice president).

*The Plaintiffs*:  The court certified a plaintiff class in this case consisting of the Thrift Plan itself and all Thrift Plan participants and beneficiaries who held a beneficial interest in IPALCO stock on or about March 27, 2001 that was exchanged for AES stock.  The named class representatives are Joseph J. Nelson and Michael Wycoff.

Mr. Nelson worked for Indianapolis Power & Light for 31 years.  After the AES purchase, he lost his job in 2002 when he was 57 years old.  He worked in the coal and ash department, primarily as a manager, doing and supervising some of the most difficult work at Indianapolis Power & Light.  Mr. Nelson joined the Thrift Plan early in his career with Indianapolis Power & Light.  He invested over the years, steadily increasing the percentage he invested.  By the time he retired, he was investing 13 percent of his pay in the Thrift Plan.  He also benefitted throughout his career from the employer match of four percent of his pay.  In March 27, 2001, his Thrift Plan account was worth approximately $300,000.  His account was invested 100 percent in IPALCO stock that converted to AES stock. By September 2002, his AES stock in the Thrift Plan had dropped in value to $17,185.  At the time of trial, its value had climbed back up to more than

$100,000.  At the time of trial, his account was still all invested in AES stock.  Tr. 293.

Mr. Wycoff worked for Indianapolis Power and Light as a computer operator, programmer, and analyst, and then as a payroll team leader for 22 years.  He left the company in November 2000 after IPALCO shareholders approved the AES deal.  His job included responsibility for keeping records for the Thrift Plan and producing the individual account statements for Thrift Plan participants and beneficiaries.  He also joined the Thrift Plan as soon as he was eligible and increased his contributions over the years from four percent to ten percent.  He originally invested all of his contributions in IPALCO stock but diversified several years before the AES deal.

When Mr. Wycoff learned of the proposed sale, he immediately began researching AES and noticed the recent increases in its stock price.  Tr. 318.  The more he learned about AES, the less he liked the deal.  Mr. Wycoff became an outspoken critic of the proposed deal.  Before the deal closed, he sold all the IPALCO stock that he controlled in his Thrift Plan account.  He retained about $5,500 in IPALCO stock, which was the employer match required to be held in the form of employer stock.  That remaining IPALCO stock then became AES stock when the deal closed.  He could have liquidated even the employer-match stock when he left IPALCO in November 2000, but he did not.

Overall, the plaintiff class consists of approximately 1800 individual members. Their Thrift Plan investments in IPALCO were valued at approximately $145 million at the time of the closing on March 27, 2001 when they converted to investments in AES.

II.     *Thrift Plan History and the 1995 and 1997 Amendments*

    A.     *Investor Choices*

The Thrift Plan originally offered employees only two choices for investments: IPALCO stock and U.S. government bonds. The employer matching contributions were always made in the form of IPALCO stock. In the mid-1990s, most employee investments were in IPALCO stock. IPALCO encouraged such investments. Plaintiffs offered persuasive evidence that there was an informal culture within IPALCO and among employees to encourage both participation in the Thrift Plan in general and investments in IPALCO stock in particular.

IPALCO's separate defined-benefit retirement plan did not invest in IPALCO stock, at least at any time relevant to this case. That practice avoided one of the most dangerous pitfalls for employees – having both their employment and all of their retirement benefits depend on the success of just one company. See Tr. 1000 (Malkiel). IPALCO made the Thrift Plan available to employees on a voluntary basis to supplement their retirement benefits through regular saving and investing, especially in the company. As a matter of plan design, at least prior

to Thrift Plan amendments in 1995 and 1997, there was always a significant investment risk for employees in having their Thrift Plan investments concentrated in the stock of their employer.

In 1995 and 1997, IPALCO agreed with its principal employee unions to modify the Thrift Plan to expand the investment options available to employees. Through a contract with Merrill Lynch, employees could direct their investments as of 2000 among nine different investment vehicles with a wide range of strategies and risks. The options included, from most conservative to most risky, one cash-equivalent fund, two bond/fixed income funds, one blended or "allocation" fund, and four equity mutual funds. The ninth option, the one with the highest risk, was IPALCO stock. At all times relevant to this case, Thrift Plan participants were entitled to shift their investments among the different funds every business day, without restriction. Ex. 512 at 022384.[3]

B.    *Investor Education Efforts*

After IPALCO amended the terms of the Thrift Plan in 1995 and 1997 to expand the investment options, the Pension Committee arranged a series of

---

[3]Those choices were available for the employees' own contributions. The picture for employer matching contributions was more complicated. Employees could shift the so-called "old employer match" from before 1995 and 1997 (different dates for different employees, depending on contracts with two different unions and separate arrangements for non-union employees) between IPALCO stock and government bonds. The "new employer match" after 1995 or 1997 was required to be held in the form of IPALCO stock. Ex. 512 at 022384.

meetings for all Thrift Plan participants.   Each meeting was conducted by a member of the Pension Committee.  Representatives of Merrill Lynch explained the investment options to the participants.  Merrill Lynch provided detailed brochures that explained the basics of investing and investment choices to Plan participants. One of the clearest messages from both the oral presentations at those meetings and the written materials was the need to diversify investments.  The program guide book for Thrift Plan participants described IPALCO stock as the investment that "generally carries more risk" than the mutual funds offered through the Plan. Ex. 512 at 022376.

Exhibit 453 is an enrollment kit for the Thrift Plan in 1995 and is another example of the education efforts.  The book included "Five Principles of Investing." The third was the uncontroversial advice: "Invest wisely."  The brochure explained that investing wisely meant diversifying investments to spread risk, as well as allocating investments among different investment vehicles depending on age and other individual factors.  Ex. 453 at 48842, 48846, 48861.  The Merrill Lynch materials taught that each individual would need to make individual decisions about how best to allocate investments among the different choices, depending on individual circumstances.

The brochure illustrated the need to diversify with examples of three hypothetical investors' choices at different ages and stages of their careers.  The most aggressive suggested profile was for a younger person with a portfolio

weighted heavily toward equity funds for long-term growth.  That highest-risk profile included only 20 percent of the investments in IPALCO stock.  The percentages for the two profiles of older, more conservative investors were 10 and 5 percent for IPALCO stock.  Ex. 453 at 48846.  The Merrill Lynch materials put IPALCO stock in the highest risk category of all the available choices.  Ex. 453 at 48844.  For the many Thrift Plan participants who chose to invest heavily in IPALCO stock, those risks produced high rewards in the latter half of the 1990s.  The annual total returns for Thrift Plan investments in IPALCO stock were as follows: +35.28 percent in 1995, +13.30 percent in 1996, +58.49 percent in 1997, +35.27 percent in 1998 and –36.55 percent in 1999.  Ex. 162.  Even after taking into account the sharp drop in 1999, the five years still produced an average annual return of +15.81 percent.  *Id.*

Investor education continued after the 1995 and 1997 Thrift Plan amendments.  Merrill Lynch representatives were available to provide advice at no charge to Thrift Plan participants. (Plaintiff Wycoff met with a Merrill Lynch adviser at the IPL headquarters at no charge.)  The Merrill Lynch advisers' telephone number was even listed in the IPL internal phone book.  Merrill Lynch representatives continued to provide educational materials for Thrift Plan participants on a periodic basis.  Exhibit 158 is a 1999 set of slides for Thrift Plan participants about their investment choices.  The slides also emphasized the need to diversify risk and allocate investments among different choices.  IPALCO stock was identified as *the highest risk* among the investment choices available through

the Plan.  Ex. 158 at 57426.  Exhibit 558 is a similar example from some time after March 31, 2000.  This exhibit included the same information about the importance of diversifying investments and the risk of a heavy investment in IPALCO stock.  See Ex. 558 at 40406 (putting IPALCO stock in the riskiest category of available investments).

The message on the need to diversify had some effect, but it was limited. Some Plan participants obviously heard the message.  By way of example, plaintiff Wycoff remembered attending the Merrill Lynch meetings about the changes to the Thrift Plan.  He remembered that the speaker said:  "you need to diversify, diversify, diversify.  That's one of his big war whoops."  Tr. 315.  Mr. Wycoff met with the Merrill Lynch adviser and discussed both his Thrift Plan account and other assets that he and his wife owned.  He transferred all IPALCO shares in his account (other than employer matching contributions) to other types of investments.  He recalled that he lost money on the diversified investments, Tr. 317, which was during years that IPALCO stock was appreciating substantially in value.  See Ex. 162.

Plaintiff Nelson was aware that he could shift his Thrift Plan investments to other options in 1995.  He recalled attending one of the original Merrill Lynch meetings and being told about investments with different degrees of risk and the need to diversify.  Tr. 287.  Mr. Nelson never changed his investments in IPALCO

stock. His account remained 100 percent IPALCO and then AES stock, even up through the trial.[4]

Looking beyond the two named plaintiffs, the record shows a modest degree of diversification by plan participants away from IPALCO stock, but far less diversification than any competent adviser was recommending or would recommend. At the end of 1999, the total value of the Thrift Plan assets was $205.9 million, of which $158 million or 77 percent was invested in IPALCO stock. Ex. 71 at 215. At the end of 2000, the total value of Thrift Plan assets was $262.3 million, of which $199.3 million or 76 percent was invested in IPALCO stock. *Id.* By March 2001, the total value of the Thrift Plan was $228.1 million. The total value of AES common stock in the Thrift Plan at the same time was $145.4 million, or 64 percent. Ex. 1012.

Plaintiffs have argued that inertia and corporate culture play significant roles in individual investment decisions, both in general and in the Thrift Plan. The basis for the opinion of plaintiffs' expert witness on this subject, Mr. John Guy, was quite thin, but the results of the Merrill Lynch educational efforts are consistent with the plaintiffs' view. The employees in this case developed a degree

---

[4]Mr. Nelson testified that he was told, or at least understood from the Merrill Lynch presentation, that it would do him no good to diversify his investments unless he had at least $400,000 in his account. Tr. 257-58. The court finds that Mr. Nelson honestly remembers that, but the court finds that he was mistaken about what he was told. No competent investment adviser would have given that advice. If one had done so, others in the meeting would have called him on the point.

of loyalty to their employer that was expressed in their investment choices. Management encouraged that loyalty and the investments in the company. Over the years, IPALCO stock was generally very profitable for the employees. Employees did not shift away from established habits. At the same time, it is beyond dispute that Plan participants had the power to make their own decisions about their investments and accounts. The court finds that IPALCO and the Pension Committee made reasonable investment choices available to participants and made reasonable efforts to inform participants of their rights and to provide prudent advice about how to use that power. The choices, apart from the new employer match, belonged to the participants.

C.   *Plan Terms on Investment Choices*

One central issue here is whether the Pension Committee could have and should have acted in 2000 or early 2001 to remove IPALCO stock as an investment option for Thrift Plan participants.

As a matter of plan design, the Thrift Plan established as "available investment options" Funds A through H. Exhibit 94 (the Plan) § 305.10. The Thrift Plan expressly provided: "Employer Allocations for Participants shall be Designated Fund B Contributions and, thus, invested entirely in Fund B." Plan § 305.30. Fund B consisted of "Common Stock," which was defined as the stock of IPALCO or any successor. Plan § 301.170 & § 101.190. The Plan further provided that "Designated Fund B Contributions" – *i.e.,* the "new employer match"

-15-

– were "required to be held in Fund B at all times until distribution."  Plan § 301.320.

The Thrift Plan also provided:  "Without the need of formal amendment and subject to any rules and conditions set forth in the Thrift Plan, the Committee may modify the available investment Funds."  Plan § 305.10.  The very next sentence provided:  "Notwithstanding anything contained in this Subsection to the contrary, the Funds shall be subject to the other special rules provided in Subsections 305.30 and 305.40."  In turn, Section 305.30 contained the directive: "Employer Allocations for Participants shall be Designated Fund B Contributions and, thus, invested entirely in Fund B."  Section 305.40(a)(i) provided: "Designated Fund B Contributions may not be shifted from Fund B."  The Thrift Plan could not reasonably have been clearer in requiring originally that the employer's matching contributions be invested in IPALCO common stock, and in requiring that those investments be held in the employer's stock until distribution. Those original requirements in the Plan itself did not violate ERISA.

Plaintiffs contend that Section 305.10 of the Plan still would have allowed the Pension Committee to remove "Fund B" as an option for the employees' own contributions.  The court is not persuaded that plaintiffs are correct on this issue. The Plan expressly required that employer contributions be kept in the form of "Fund B" as IPALCO stock.  The Pension Committee would have violated the Plan terms if it had tried to eliminate or redefine Fund B.  Although the Plan language

did not expressly require that Fund B remain available for employee contributions, the Plan clearly assumed that it would. If the Pension Committee had acted on its own to eliminate Fund B as an available choice for employee contributions, and if the stock had then increased significantly in price, the Pension Committee members no doubt would have been accused of having violated their fiduciary duties by violating the terms of the Plan that assumed Fund B would be available for employee contributions. The discretion given to the Pension Committee certainly included choices from among different mutual funds and other investment vehicles, but it did not include the ability to prohibit employee investments in employer stock.

III.    *IPALCO in 1999*

The AES transaction and the disputes in this case must be understood in light of the strengths, weaknesses, prospects, and risks of IPALCO before the discussions that led toward the transaction. The evidence about IPALCO echoes Dickens: It was the best of times (in plaintiffs' view), it was the worst of times (in defendants' view). The court will try to present an objective view.

IPALCO and its corporate predecessors had been independent throughout their history. The principal asset had always been the electric public utility in Indianapolis. Its service area was already fairly densely developed with industrial, commercial, and residential customers for IPALCO, with limited opportunity for significant growth at the retail level for supplying electricity. Demand for its retail

electricity was growing approximately three percent per year.  The small service area was also surrounded completely by another public utility, one that IPALCO had tried unsuccessfully to acquire in a hostile takeover bid in the early 1990s. See Tr. 703-04 (Holstein), 805 (Humke).  IPALCO generated the vast majority of its power by burning high-sulfur coal, which was a cheap source of energy. IPALCO also had not made any disastrous investments in nuclear power generation in the 1970s and 1980s.  As a result of all those factors, IPALCO could generate and distribute electric power at low cost.

Within its industry, IPALCO was relatively small, well-managed, and profitable.  See Tr. 377-79 (plaintiff's expert Guy, also referring to "this jewel of a small company").  Its market capitalization for its common stock was in the neighborhood of $2 billion.  In 1998, the company was recognized as the "Number One" electric utility in the United States in terms of total shareholder return from each utility's date of founding.  Tr. 125.  At the same time, IPALCO had limited opportunities for growth, whether measured in terms of gross revenues or earnings.  See Tr. 799 (Humke), 617-18 (Tabler).

The IPALCO board of directors had fifteen members.  Thirteen were independent outside directors with broad experience and success in a variety of industries.  Only two directors were inside officers, defendants CEO Hodowal and COO Humke.  The evidence showed that the directors had a distinct preference for keeping IPALCO independent.  In early 2000, the directors were skeptical, and

even resistant, toward the idea of a transaction that would lead to the company's acquisition. See Tr. 137 (Hodowal), 624-25 (Tabler), 839-42 (Humke).[5]

The CEO of IPALCO was defendant John Hodowal. He had worked for IPALCO since 1968 and had been CEO since 1989. In late 1998, Hodowal told the board that he was thinking of taking early retirement in 2000, when he would turn 55 years old. He also advised the board that COO Ray Humke, who was considerably older than Hodowal, was also thinking of retiring. Humke had joined IPALCO in 1990 after a long career in the telephone industry, one that straddled the transition from the old days of the regulated "Ma Bell" monopoly through the court-ordered break-up of AT&T and into the restructured world of competitive telephone services. Hodowal and the board began considering possible plans for new leadership of the company.

Historically, IPALCO stock had been a "widows and orphans" stock, one that paid regular dividends and maintained a stable value with relatively steady and modest growth over time. That changed in 1997. In that year, IPALCO cut its dividend by one-third and borrowed money for a stock repurchase program.

---

[5]Plaintiffs objected to this evidence as inadmissible hearsay. Hodowal, Tabler, and Humke could testify as to statements by others reflecting their states of mind. See Fed. R. Evid. 803(3). As people who had been through the entire process of considering and then agreeing to what ultimately became the AES transaction, these witnesses were in a position to know the board members' states of mind, and it was their job to do so. Their testimony on this point was strong, credible, and undisputed. Their testimony was also consistent with the IPALCO board's efforts to secure independent strategic advice from Goldman Sachs, as discussed below.

Investors who preferred a steadier and higher dividend could sell if they wished to do so.  Both those who held their stock and those who sold profited, at least through the end of 1998.  Tr. 123-25.

The year of 1999 was very different.  The value of IPALCO stock fell nearly 40 percent in that one year.  See Ex. 90.  That dramatic decline, before what became a much wider stock market drop in 2000 and 2001, is difficult to reconcile with plaintiffs' description of IPALCO as a low risk "widows and orphans" stock as of 2000, when the decisions at issue here were made.

During late 1999, Hodowal put his retirement plans on hold, at least temporarily.  He and the board began efforts to consider strategic options for the company to preserve and restore stock value.  Those deliberations eventually led to the AES purchase of IPALCO (and to Hodowal's retirement).

In the course of those deliberations, the IPALCO board of directors and officers heard presentations from experts both inside and outside the company on changes in the electric industry and the challenges the company faced.  The two principal developments in the industry were consolidation and the prospect of deregulation, with concerns about environmental regulatory changes placing a close third.  All three posed significant threats to the relatively stable and profitable status quo at IPALCO.

*Industry Consolidation*: The electric industry was consolidating at an increasing pace in 1999. The IPALCO board heard that message from outside investment bankers and from inside executives. That continued consolidation meant that if IPALCO remained independent and did not grow by acquisition or other new investment, its relative size would shrink. Ex. 160 at 057721; Tr. 732 (Holstein). IPALCO's options for major acquisitions were quite limited.[6]

*Deregulation*: The term "deregulation" can mean a number of different things. In 1999 and 2000 in the electric industry, it meant legislation that would expand competition at both the wholesale and retail levels of the business. At the retail level, the prospect was that state regulatory agencies would no longer directly control retail prices, and retail customers would choose from among competing electricity providers. One key dimension of a deregulated retail system is the price that an incumbent local electric company charges competitors for using its distribution network to reach their retail customers. No realistic plans for competition in retail electricity included plans to duplicate the local "last mile" of distribution networks that connect nearly every home and business in the United States to one integrated "grid." Instead, plans to deregulate retail electricity service generally require the existing retail provider to allow other

---

[6]The evidence in this case supports an inference that the acquisition of IPALCO by a larger company became nearly inevitable when IPALCO's hostile takeover bid for the parent company of Public Service Company of Indiana, Inc. failed in the early 1990s. PSI was acquired instead by what became Cinergy, which has since been acquired by Duke Energy. After IPALCO's hostile bid failed, IPALCO's principal public utility business was surrounded completely by another company that was too large for IPALCO to acquire.

companies to sell electricity to the existing provider's customers using the existing provider's wires.    One critical feature of those arrangements is whether the existing provider is allowed to charge rates that allow it to recover its so-called "stranded" costs – investments it has already made in its distribution network and generating capacity.

More than half a decade later, after the California deregulation debacle and the collapse of the Enron Corporation, hindsight makes it easy to minimize both the prospect of deregulation as it appeared in 1999 and 2000 and the risks it posed then for IPALCO.  The board heard predictions that deregulation could produce a reduction of 25 to 30 percent in prices for electricity.  These predictions were based on evidence that included experience in the United Kingdom and Australia.  IPALCO's chief financial officer John Brehm told the board that a decline of half that amount, 15 percent, would eliminate half of IPALCO's net income, which would have devastating and long-term effects on the stock price. Tr. 696-97.    Surrounding states had adopted some form of deregulation legislation, and Indiana had considered it.  IPALCO was also concerned that it would face competitors who would receive unfair regulatory advantages under deregulation legislation.

This case is not the occasion for a detailed review of the conflicts within the electric utility industry over stranded cost recovery, but a few basics are important.  What was billed as "deregulation" in the energy industry in 1999 and

2000 often seemed quite profitable for many electric companies, provided the legislation allowed them to recover their stranded costs – *i.e.*, their investments in less productive or non-productive assets.  From IPALCO's perspective, those features of deregulation schemes had the perverse effect of rewarding companies that had made poor investments in expensive generating plants and distribution networks, while punishing more prudent companies like IPALCO that had not.

Plaintiffs have argued that deregulation was (a) not imminent and (b) not a genuine threat to IPALCO.  That argument benefits from hindsight, especially after the California debacle and the collapse of Enron.  Plaintiffs' argument does not accurately reflect either the issues the IPALCO board faced or the threat as it appeared in 1999-2000.[7]  The IPALCO board was not trying to predict whether deregulation was likely to occur within the next one to two years.  It was trying to decide whether to adhere to the company's established strategy of remaining independent in the face of revolutionary changes in the industry.  Based on the information available to it at the time, the board reasonably perceived a significant risk that IPALCO would be marginalized in the industry as a small company that no one wanted, so that shareholder value could decline sharply and permanently.  Also, while many electric companies had managed to influence state deregulation

---

[7]Writing on behalf of the Electric Utility Workers Union, plaintiff Michael Wycoff circulated a letter to IPALCO employees opposing the AES deal in the fall of 2000, shortly before the October 20, 2000 special shareholder meeting to approve the AES deal.  He wrote then:  "We all know the Electric Utility Industry is changing and that it will become deregulated in time.  We also knew that IPALCO would eventually be merged some how some way with another Utility.  If not now, then eventually."  Ex. 14.

legislation in ways that were profitable, see Ex. 154 at 001831, that pattern did not appear likely to help IPALCO, which did not need any large-scale recovery of stranded costs.  Plaintiffs also pointed out correctly that IPALCO was trying to support deregulation legislation.  Those efforts are best understood as defensive efforts to minimize the potential harm and not to be limited to a passive role on the sidelines as deregulation proceeded.

*Environmental Concerns*:   IPALCO produced virtually all the power it generated by burning high-sulfur coal.  Most of that high-sulfur coal was from Indiana or other nearby locations, and it had been a relatively low cost source of fuel.   What is meant by environmental concerns here is the prospect that enhanced restrictions on air pollution resulting from high-sulfur coal would cause increases in IPALCO's costs that it could not expect to recover entirely from its customers, especially if deregulation and competition forced electricity prices lower.  For the board considering the company's long-term strategies, there was a clear risk that the company's nearly total dependence on high-sulfur coal would expose it to risks that other companies in the industry would not face, at least to the same degree.

From all of this evidence, the court finds that in 1999 and 2000, the IPALCO board could not simply assume that the company's future would resemble its past.  Nor could its shareholders, including the plaintiffs.  What had seemed for many years like a fairly safe and profitable "widows and orphans" stock had

become riskier in the face of these changes and potential changes in the electric industry. In fact, the court finds that the IPALCO directors reasonably feared that if they did nothing, changes in the industry could cause a sudden and irreversible loss of shareholder value, dropping from a range near $20 per share to as low as $4 to $6 per share. See Tr. 157 (Hodowal) (describing board discussion).

IV.    *Exploration of a "Transforming Transaction"*

In the autumn of 1999, IPALCO management presented the IPALCO board with information about the company's recent stock performance, which had been painful, and these changes and potential changes in the industry and the strategic alternatives open to the company. See Ex. 159 (board minutes from Oct. 26, 1999); Ex. 160 (board minutes from Nov. 30, 1999).

By the time of the February 29, 2000 board meeting, Hodowal and IPALCO management had set the table for the board to consider the possibility of seeking a buyer for the company. The board heard additional presentations on IPALCO's poor stock performance and the poor performance of electric company stocks generally. CFO Brehm evaluated the prospects that IPALCO's stock price might return to its record high of about $28, which had been reached at the end of 1998. He advised that it was possible, but only if everything went perfectly and if the company were not hurt by risks beyond its control. Ex. 164 at 016636-37; Tr. 617 (Tabler), 133 (Hodowal). The factors that could prevent the stock price from returning to the $28 high included declining international power prices (especially

after deregulation), improved technology allowing energy consumers to receive real-time price signals to manage their demand better, but with the effect of reduced value of electrical generating assets, and tighter environmental regulations.

At the same meeting, the board heard from an investment banking firm then known as Warburg Dillon Reed ("Warburg").  The Warburg bankers generally agreed with earlier reports by Michael Holstein (IPALCO vice president for strategic business initiatives) and CFO Brehm about the consolidation in the industry.  Most important, Warburg warned that small to medium-size companies such as IPALCO "with regional or niche strategies are being bought out or marginalized into distressed merchandise." Ex. 164 at 016639.

This prospect of "marginalization" and becoming "distressed merchandise" played a decisive role in the IPALCO board's decisions in 2000.  Board members Ben Lytle and Joseph Barnette had both been CEOs in Indiana in industries that had recently undergone their own processes of consolidation – Lytle in health insurance and Barnette in banking.  Lytle advised the board that marginalization could involve "a huge loss of value very quickly." Ex. 164 at 016638.  Barnette commented on the fate of regional bankers:  "early in the process, bankers' worst fear was that they would be acquired; it soon changed to the fear that no one would want them." *Id.*  Translated to IPALCO's situation in early 2000, the board faced the prospect that changes in the consolidating electrical industry would

produce a sudden and irreversible loss of shareholder value. The board could not close its eyes to that risk.

The IPALCO board's strategic discussions covered several possibilities, including entering into non-regulated businesses with greater profit potential, adding generating power, buying other businesses, and combining with a larger and more diverse company. Tr. 127-28 (Hodowal), 804-06 (Humke). None of these options appeared better than the prospect of what was euphemistically described as a "transforming transaction" with a buyer.

At the February 29, 2000 meeting, the board agreed to hire Warburg to advise on a potential transaction. Plaintiffs pointed out that Warburg's views, despite its expertise, should be viewed skeptically because of the fee Warburg stood to earn through its work on the transaction. At the suggestion of IPALCO board member Mitchell Daniels,[8] in March the board directed management to engage another investment bank with expertise in the electric industry to provide a second opinion that could not be influenced by any financial incentive that depended on the board's ultimate choice about strategy. Several directors suggested engaging Goldman Sachs for this purpose, and the company did so. See Ex. 165 at 16646. In late April, Goldman Sachs essentially agreed with Warburg about the challenges IPALCO faced and supported the basic strategy of

---

[8]Daniels was then a senior executive with Eli Lilly and Company. In January 2001 he became the Director of the federal Office of Management and Budget. In January 2005, he became Governor of Indiana.

looking for a buyer.  See Ex. 167.  Otherwise, shareholders faced high risks of an irretrievable decline in shareholder value.  See Tr. 73 (Hodowal), 623 (Tabler), 811-13 (Humke), Ex. 951 at 74 (Daniels).

The board met again on March 28, 2000 and addressed the strategic issues. Ex. 165.  Warburg bankers reported on their contacts with potential buyers.  At that meeting, Hodowal stated that he would not be interested in leading a leveraged buy-out of the company.  Also, in response to a concern raised by at least one director in light of the cash benefits to Hodowal and Humke from a change in control, Hodowal and Humke reported that they had given signed and undated letters of resignation to the chairman of the board's compensation committee and the company's general counsel.  Ex. 165 at 16644; Tr. 596-97 (Tabler), 755-56 (Humke).  Hodowal also told the board that he was willing to stay at the company and to put aside his plans for retirement if the board wanted him to do so.  See Tr. 145-46 (Hodowal).

At its April 19th meeting, the IPALCO board heard a presentation by Goldman Sachs with its overview of the electric industry.  See Ex. 167.  That overview reflected the key risks that IPALCO was facing, consistent with what the board had heard from Warburg, including deregulation, environmental risks, and outside economic factors that seemed to make it difficult to increase shareholder value.  Goldman Sachs identified as a positive for IPALCO its "generally supportive regulatory environment" with only "modest" fears of punitive deregulation

legislation.  *Id.* at 8635.  Goldman Sachs identified as negatives for IPALCO its small size in a consolidating industry, no growth to low earnings growth in its core regulated electric utility business, and the difficulty of "redeploying" capital to businesses with higher earnings growth.  *Id.*

By the April 19th meeting, the Warburg efforts to identify a buyer focused on two firms known as Laurel Hill and Madison Dearborn.  Both were what Hodowal described as "financial" buyers, as opposed to "strategic" buyers. Hodowal had concerns about what a financial buyer might do to the company, its employees, and the community in order to turn a profit on its investment.  He generally preferred a strategic buyer, another company in the business that would be able to find synergies and make a profit without inflicting a great deal of pain on employees and the community.  See Tr. 147-49.  As of the April 19th meeting, Warburg had not found any interest among strategic buyers.[9]

The IPALCO board met again just six days later, on April 25, 2000.  The principal new development was that AES had contacted Hodowal and had expressed interest in a possible acquisition of IPALCO.  AES would be a strategic buyer.  Hodowal reported to the board on the three prospective buyers, Laurel Hill, Madison Dearborn, and AES.  See Ex. 51 at 014795-96 (proxy statement report

---

[9]One of the investment banks compared financial buyers and strategic buyers in a way that made the financial buyers seem more likely to benefit employees.  The court finds Hodowal's views on the question more persuasive for the long term.

on consideration of transaction).  The board minutes for the meeting reflect that there was "considerable discussion" and that "each Board member who was not an employee of the Corporation spoke in favor of pursuing a satisfactory agreement on a transforming transaction."  Ex. 168 at 8660A.

This meeting was the watershed moment for IPALCO and its board.  The board members had been reluctant to take the step of selling the company.  The directors concluded, nevertheless, that their duties to shareholders required them to try to avoid significant losses in shareholder value.  The comments of directors Barnette and Lytle, based on observations in their own industries, reflected the perception that doing nothing carried with it high risks for IPALCO shareholders. The court is persuaded that IPALCO's board came only reluctantly to the conclusion that it was prudent to explore the possible sale of the company.  The views of management, including defendants, are discussed in more detail below.

V.    *Negotiations with AES*

On May 19, 2000, AES proposed an all-cash transaction for $25.00 per share of IPALCO stock.  IPALCO stock was then trading for $19.50.  Ex. 90. Laurel Hill and another potential buyer withdrew from the negotiations around that time. Ex. 51 at 014796.  Negotiations continued through May and June.  On June 20th, Madison Dearborn proposed an all-cash transaction for $23.50 per share.

On June 22nd, AES told IPALCO that it was no longer willing to pay $25.00 cash per share but that it would offer $25.00 in AES stock for each share of IPALCO stock.  This shift from a cash deal to a stock swap was a major focus of the trial.  The shift happened quickly and with very little documentation.  Plaintiffs contended the speed and the lack of questioning by IPALCO management show that IPALCO management was trying to complete the deal at all costs, even if that meant high risks for shareholders, including Thrift Plan members.   The explanation provided by witnesses was that AES decided it did not want to commit the needed proportion of its available debt limits to the IPALCO transaction because such a large commitment would limit AES's ability to do other transactions it wanted to pursue.  *E.g.*, Tr. 677-79 (Brehm).

The court is not persuaded that there was anything suspicious about the change.  As a matter of negotiation, perhaps, it raised questions about the prospect of "bait-and-switch" negotiation tactics, but AES made its intentions clear to IPALCO at a time when IPALCO could have backed away from a transaction if it had wished to do so.  IPALCO had not yet agreed to negotiate exclusively with AES when IPALCO's officers and directors learned of the change.  AES had a complex and large array of debt in its capital structure.  The court finds credible the explanation that AES preferred to do the IPALCO deal through a stock swap so as to preserve its ability to borrow to help finance other transactions around the world.

From the perspective of IPALCO, the change from cash to AES stock as the "currency" of the transaction added an extra layer of complexity to the deal. IPALCO needed to hedge against future fluctuations in the value of AES stock to ensure that an exchange of stock at the future closing date would provide fair compensation to IPALCO shareholders. The result was an agreement to determine the all-important exchange ratio based on the price of AES stock shortly before the closing, and to provide certain "collar" mechanisms that would modify the deal or even allow IPALCO to walk away from it if the price of AES stock dropped too low.

When AES changed its offer from cash to stock, IPALCO's board and management already had some information about AES from presentations by the investment bankers advising them about a possible deal. The change in the terms of the offer required a closer look at AES. The specific issue was whether AES stock would hold up as a solid currency for the IPALCO acquisition between the time of an initial deal and a final closing, and perhaps at least long enough after closing to give IPALCO shareholders who wanted to sell their stock in the company enough time to do so. Tr. 708 (Holstein).

When IPALCO learned of the change in the proposed structure, Hodowal organized a team under the leadership of CFO Brehm to address those concerns by doing appropriate due diligence on AES. The record is a little confusing on the details, but it appears that at least Brehm and perhaps others began looking closely at AES in the five days between June 22nd and the June 27th IPALCO

board meeting.   After the IPALCO board agreed on June 27th to negotiate exclusively with AES, a larger due diligence team continued the effort for another week to ten days, up until shortly before the July 14th IPALCO board meeting when the board voted to accept the AES offer.   The IPALCO due diligence group reviewed public documents (especially SEC filings) for AES and prepared a list of questions for a meeting with AES management in Virginia.

In an attempt to pin defendants on at least one horn of a dilemma, plaintiffs have criticized the IPALCO effort as too meager, yet they have also argued that they received so much non-public information that the IPALCO insiders (officers, directors, and members of the due diligence team) should be treated as if they were AES insiders.   The evidence showed that AES shared some of its internal financial projections with the IPALCO team.   Those internal projections were at least consistent with the contemporaneous Wall Street analysts' projections for AES earnings.   Brehm testified that the internal numbers from AES showed that it was beating analysts' projections in 2000.   The internal data from AES certainly did not provide any inside information of financial weakness at AES or a risk of a sharp decline in its stock a year in the future.   There is no evidence that the IPALCO due diligence team or any other IPALCO officers or directors obtained any other material non-public information about AES.

Even at that point in late June 2000, the IPALCO board had heard a good deal of information about AES as a potential buyer.   IPALCO was still negotiating

with Madison Dearborn, though its ability to finance the deal was still uncertain. Madison Dearborn was proposing a cash purchase for $23.50 per share, as compared to AES's offer of stock worth $25.00 at closing (subject to the rather complex valuation method, which turned out to provide stock worth a little less than $23.00 upon closing).

The IPALCO board met on June 27, 2000 to consider the two offers, and it decided to pursue only the AES offer at that point. The board's discussion that day was not well-documented. Based on the testimony of witnesses and the nature of the offers, the court finds that one principal advantage of the AES offer was that it appeared, at least, to offer higher value to the shareholders. (The Madison Dearborn offer also could have dropped in value in further negotiations, as the AES offer did, but the AES offer appeared then to be higher.) Another major advantage of the AES offer was that it would be a "strategic" buyer, one already in the business. IPALCO reasonably thought the AES deal offered better long term prospects for IPALCO employees, shareholders, and the community. The difference between cash and stock currency did not appear to be a disadvantage at that time. IPALCO shareholders who preferred cash to AES stock could easily sell their stock at any time, apart from the new employer match in the Thrift Plan.

On July 14, 2000, the IPALCO board met and gave its approval to the terms of the transaction with AES. According to the terms of the agreement, on the

closing date, each share of IPALCO stock would be exchanged for a fraction of a share of AES. As explained in the proxy statement, the exchange ratio was to be based on the price of AES shares shortly before the closing date.

IPALCO's board and management believed they had negotiated a substantial premium over IPALCO's earlier share price. The proxy statement said that the purchase price of $25.00 per share represented a premium of 16.3 percent over the closing price of IPALCO stock the last day before the deal was announced. Ex. 51 at 14798. The proxy statement identified the risk posed by volatility of AES stock before closing. *Id.* at 14798-99.[10]

_____

[10]The final exchange ratio based on a purchase price of $25.00 was determined five business days before the closing based on the average daily closing prices of AES common stock for the preceding 20 trading days. The final exchange ratio was subject to some limits. If AES stock dropped below $31.50 before closing, IPALCO shareholders would receive 0.794 AES shares. If the price of AES stock dropped below $26.45 (an effective price of $21.00 per IPALCO share), IPALCO would have the right to terminate the transaction. Ex. 51 at 14777.

In one of the odder portions of the trial, plaintiffs argued that IPALCO shareholders received no premium in the AES deal because the closing price for IPALCO stock on the last day before closing was only seven cents below the price of AES stock multiplied by the exchange ratio. See Tr. 106-11. That comparison showed only that, by the time of closing, investors were confident that the deal would actually close. See Tr. 743 (Holstein). To measure a relevant premium for IPALCO shareholders, one must compare the closing price to the value of IPALCO stock at some point in time (there are several candidates) before the public announcement of the AES acquisition for $25.00 per share. Nevertheless, the fact remains that the complex pricing formula and the fluctuation of AES stock price before and up until closing meant that IPALCO shareholders actually received stock with a market price of only $22.96 per share of IPALCO, well below the expected $25.00, which the court had thought was the point of plaintiff's line of inquiry. See Tr. 110; see also Ex. 167 at 8640 (Goldman Sachs advice to IPALCO board in spring of 2000 that shareholders had not reacted well to mergers in

(continued...)

After the IPALCO board vote on July 14th to be purchased by AES, the written agreement was signed on July 15, 2000.  The deal was announced publicly on Monday morning, July 17, 2000.

IPALCO and AES expected they would be able to gain needed governmental approvals for the transaction and that the deal would close in early 2001. Delaying the closing until early 2001 allowed a reasonable time for the parties to go through the needed governmental processes.   Delaying the closing past December 31, 2000 also allowed IPALCO executives who had Termination Benefit Agreements ("TBAs," a/k/a "golden parachutes") to increase the value of those TBAs by millions of dollars.   Those with TBAs included all the individual defendants. The TBAs called for a payment of 2.9999 times each executive's average W-2 income over the past five calendar years before closing.  Closing after the end of 2000, the IPALCO executives had the opportunity to exercise various stock options before the end of the year, and most did so.  The exercise of those options generated taxable income that increased the W-2 reported income.  The value of each TBA increased by approximately 60 cents for every dollar in additional income realized through the exercise of the stock options in 2000. Additional details on the TBAs are set forth below in Part IX-A.

_____

[10](...continued)
electric industry because of a devaluation of equity currency of the buyer and ineffective collars on the price).

VI.     *After the Announcement*

The AES purchase required approval by IPALCO shareholders.  IPALCO scheduled a special shareholders meeting for October 20, 2000.  A proxy statement was prepared as of September 8, 2000 and was mailed to shareholders, including plaintiffs, approximately a week later.  The proxy statement provided a detailed description of the transaction with information about AES and the risks the transaction posed for shareholders, as well as the reasons for the IPALCO board's approval and recommendation.  See Ex. 51.  Plaintiffs have not argued that the proxy statement failed to comply with applicable securities laws governing such disclosures to shareholders.

At the special shareholders meeting, CEO Hodowal spoke in favor of the transaction.  (Exhibit 193 is a video and audio recording of the meeting, and Exhibit 79 sets forth the text of his prepared remarks.)  He said in part:

> I'm also pleased to report that based on the proxies received, our shareholders are very excited about the prospect of IPALCO joining the AES Corporation so that we can leverage the talents of both organizations and meet the energy challenges of the future.

He then introduced the board and other officers, including defendants Humke and Tabler.  The other members of the Pension Committee also attended the meeting. Hodowal then described AES, noting that its returns for shareholders had totaled more than 1000 percent over the last five years.  He continued: "In short, AES is

a great company.  And as all of you know, IPALCO is a great company.  And together we will be even greater."

Hodowal then described how IPALCO had come to the transaction.  He described IPALCO's record of success and its recognition as the "Number One" electric company in terms of creating shareholder value from its founding through 1998.  He described then the "huge disappointment" of 1999, in which the company actually increased its revenues and its income, yet its stock still "plummeted 40 percent."  That experience obviously had shaken Hodowal, other managers, and the IPALCO board.  He told the shareholders that the Board had begun to consider the possibility of taking the company private.  Ex. 79 at 27131.  He pointed out that "the Board serves as a fiduciary for all our constituencies, including our shareholders and employees."  *Id.*

He summarized the proxy statement's account of IPALCO's search for buyers.  Prospective buyers who looked saw constraints on the company's growth, "by macroeconomic forces that did not favor small, coal-fired utilities with limited geographic reach and problematic non-regulated investments.  In the end, our Board came to the conclusion that all constituencies would be better served by becoming part of a larger energy company with a proven growth strategy."  *Id.* at 27132.  Hodowal continued:

> We needed more muscle, and AES had that muscle.  AES also had the strategy, had the interest, and most important offered the best package for

> IPALCO shareholders and employees, as well as the communities served by IPALCO.
>
> From a very personal point of view, I had hoped this day would never come. I had hoped, as many of you, that IPALCO could forever remain a stand-alone company. And I believe that the IPALCO family worked as hard as we could to remain independent and to sustain the stellar pattern of growth. Our board knew, however, that worse than losing independence is losing independence while at the same time losing shareholder value.
>
> This transaction represents a premium of 16 percent over the closing price of IPALCO common stock on the last trading date prior to the announcement of the share exchange agreement. It also represents a 22 percent premium over the average closing price of IPALCO common stock for the one month prior to the announcement, a 30 percent premium over the average closing price of IPALCO common stock for the one year prior to the announcement and a 52 percent premium on a year-to-date comparison basis.
>
> Apart from the stock price premium, AES has agreed to allow IPALCO and IPL to retain its local identity. It has provided job security and fair severance commitments to employees. And it has agreed to allow IPALCO and IPL employees to determine the ongoing level of community contributions.

*Id.* He opened the floor for debate. Several shareholders spoke in opposition to the transaction, including plaintiff Wycoff. The opponents argued that the AES stock price was inflated and was risky, that shareholders would be hurt by the lack of a dividend, and that IPALCO would be better off remaining independent. Ex. 193. Two of the opponents who spoke referred specifically to the fact that senior IPALCO executives were already selling large blocks of their stock.

The vast majority of shares had been voted by proxy before the meeting. General Counsel Tabler announced the vote. The vote showed that 65.5 percent of outstanding shares were voted in favor and 11.6 percent were voted against.

Ex. 79 at 27133.  After the vote was taken and the deal was approved, Hodowal concluded:

> Ladies and gentlemen, I am coming to the end of a 33-year career with Indianapolis Power & Light Company and IPALCO Enterprises.  One-third of those years were spent as your chairman and chief executive officer.
>
> It has been a privilege for me to serve with the IPALCO women and men who have worked so nobly and so caringly for the benefit of this company, our customers, and our communities.  I thank each and every one of them from the bottom of my heart.  And I thank each and every one of you for your interest and concern for this remarkable company.
>
> I truly believe the best is yet to come, and that our association with AES will help make that so.  Thank you.

See Tr. 9-10.

One point of dispute has been the capacity in which Hodowal spoke at the shareholder meeting, with a special focus on the final comment that "the best is yet to come."  Plaintiffs view that comment with understandable bitterness now that they know that Hodowal was selling his personal stake in IPALCO and that AES stock later lost 90 percent of its value.  Plaintiffs argued that Hodowal spoke in his capacity as a fiduciary of the Thrift Plan, as well as in his capacity as CEO. Defendants have argued that he spoke only in his capacity as CEO.  Cf. *Varity Corp. v. Howe*, 516 U.S. 489, 503 (1996) (affirming conclusion that employer acted in dual capacity as employer and plan fiduciary in communicating to workers about the effect that transfer of employment from one affiliate to another would have on their benefits).  CEO Hodowal testified that he never distinguished in his mind between the interests of IPALCO shareholders and Thrift Plan participants.

Tr. 52.  Neither did the other members of the Pension Committee.  They testified that in their roles on the Pension Committee, they saw no difference between the interests of Thrift Plan members and other shareholders, and that they relied on the information they learned through the IPALCO board processes and other, less formal channels.  See Tr. 777 (Humke), 933 (Califar), 589 (Tabler).  The reference to acting as a fiduciary for employees lends some support to plaintiffs, though Indiana corporation law allows a corporation's board to consider the interests of employees and other constituencies (beyond shareholders) in evaluating a transaction that will change control of the company.  See Ind. Code § 23-1-35-1(d).  The combination of all this evidence, and especially the defendants' reliance on their care for all shareholders' interests to show that they protected the interests of Thrift Plan participants, leads the court to find that Hodowal was speaking both as CEO and as a fiduciary of the Thrift Plan when he spoke at the shareholder meeting.

VII.   *Defendants' Evaluation of AES and IPALCO*

A principal focus of evidence was whether the defendants acted prudently in evaluating the AES acquisition.  More specifically under ERISA, the focus was whether IPALCO stock that would become AES stock was an appropriate investment option for the Thrift Plan participants and an appropriate form of investment for the employer match in the Thrift Plan.  Plaintiffs contended that defendants did not take prudent steps to evaluate AES, and that if they had done so, they would not and should not have allowed continued investment in IPALCO,

and thus in AES, through the Thrift Plan.  Plaintiffs also contended that defendants at a minimum should have warned Thrift Plan participants and beneficiaries of what plaintiffs called a "sea change" in the investment risk resulting from conversion of IPALCO stock to AES stock.

What did the defendants know about AES?  Before AES surfaced as a potential buyer, the April 19th presentation by Goldman Sachs to the IPALCO board showed that AES had produced a total return for shareholders in 16 months of 62.5 percent, with an estimated price/earnings ration of 25.8.  Ex. 167 at 8621.  Earnings per share growth rate was 27 percent.  *Id.* at 8626.  AES had a market capitalization of equity about 10 times that of IPALCO, and it had more generating capacity than other unregulated generators of electricity.

After AES first expressed interest in a possible acquisition of IPALCO, the IPALCO board met on May 23rd and heard a report on the status of various proposals and negotiations.  Warburg presented an overview of AES as part of its report on negotiations with all potential buyers.  Ex. 57 at 8667-70.  Warburg informed the IPALCO board that AES had equity value of more than $18 billion, that it owned or had an interest in 146 generating plants with 52,000 megawatts of electrical generating capacity, and 15 distribution businesses in 24 countries.  Warburg noted that AES had grown quickly, from $2 billion in assets in 1995 to more than $21 billion in 1999.  Its generating capacity was all over the world, and

it relied on a variety of fuels to generate electricity.  Warburg also reported on AES's very good recent stock performance.

At the June 27, 2000 IPALCO board meeting, after AES switched its offer from cash to stock, Warburg provided an update and a more detailed overview of AES.  Ex. 174.  The report noted that 73 percent of AES shares were owned by institutional investors.  *Id.* at 8736.  The report included an overview of AES's capital structure, revenues, and earnings, as well as recent stock price performance showing that AES had out-performed the S&P 500 and the S&P Electric indices over the past five years.  The report noted that Warburg itself and several other investment bank research teams had rated AES a "strong buy" or a "buy."  *Id.* at 8743.  The report noted that in the last 52 weeks, AES stock had been as high as $48.875, as low as $25.625, and was then trading at $40.875.

The information provided to the board indicated that AES was probably sound because of a solid track record of growth and profitability, even in a market sector where values tended to be declining.  The analysts' "buy" and "strong buy" recommendations must be taken with a large grain of salt, as both Dr. Malkiel and Mr. Guy testified, but the recommendations were consistent with the overall picture.

IPALCO's board decided at the June 27th meeting to negotiate exclusively with AES.  IPALCO then dispatched a team to pursue additional due diligence

concerning AES.  The IPALCO team included CFO Brehm, Michael Holstein, Dan Short, and Michael Banta, as well as Jason Sweet of Warburg.  The court credits Brehm's testimony that the team consisted of "true skeptics" from IPALCO.  Tr. 695.  (The court assumes Sweet might not have been as skeptical about the transaction.)  The team reviewed the publicly available information about AES, including its SEC filings and analyst reports.  The team reviewed some AES internal projections, submitted questions to AES, and traveled to AES headquarters in Virginia for interviews.  This work was done in about seven to ten days, just before the July 14th meeting when the IPALCO board voted in favor of the AES deal.

The purpose of the due diligence was to determine the likelihood of detrimental effects for IPALCO shareholders in the share exchange transaction. The team examined risks and risk mitigation strategies.  The team evaluated AES's credit and verified the status of planned projects.  The court credits Brehm's testimony that the team had adequate time to fulfill its purposes and was satisfied with AES's responses to inquiries.

Plaintiffs are critical of the due diligence team for having spent too little time on the project.  In light of how things turned out with AES stock, the criticism is understandable.  Ultimately, however, the criticism is not persuasive.  AES stock traded in an efficient market subject to extensive public disclosure requirements. The company and its stock were watched closely by many sophisticated investors

and analysts.  There simply is no reason to believe that the stock price at any given time, whether on July 14, 2000 or March 27, 2001, did not reflect a full and fair market assessment of the company's prospects.

The purpose of the IPALCO team's evaluation was not to evaluate AES as a long-term investment for all current IPALCO investors, including Thrift Plan participants.  The purpose was to evaluate AES as a buyer that proposed to pay with stock.  See Tr. 706-08 (Holstein).  The stock was highly liquid, traded on a national exchange in sufficient volumes to provide a ready market for any IPALCO shareholder who preferred cash to AES stock.  The due diligence team was satisfied that AES stock was solid enough to move forward with the proposed share exchange.  *E.g.*, Tr. 742 (Holstein).  The team found that AES had sustainable sources of revenue, a sound business model, and a scope and diversity of operations that created shareholder value while insulating the company against risks.  Tr. 692-93 (Brehm), 740-42 (Holstein).  The team considered the risks that AES faced and was satisfied that AES had sound strategies for mitigating those risks.  The team certainly paid attention to the debt level of AES but also noted the company's reliance on "project" or non-recourse debt to insulate the parent company in the event of failures of particular projects owned by subsidiaries.  The team also considered currency risks with AES's global operations, but concluded that the company's operations were spread among so many different currencies that currency risk was diversified.  In short, the due diligence team concluded that the AES business model was sound, that AES had

good opportunities to grow, that it was well diversified, and overall that it was a sound company.

The IPALCO board met again on July 14, 2000 and decided to accept AES's proposed share exchange. Before it did, Brehm reported on the due diligence. He reported that AES's stock was "good currency" for the transaction, that AES's prospects were good, and that any risks should be minimized by the diversity of its operations. Tr. 632 (Brehm); see also Ex. 513 (board minutes); Tr. 203 (Hodowal). The board minutes reflect that Brehm's team focused on the risk that AES stock, which was then trading at $50.375, would drop below the $31.50 collar within the next 18 months. The report noted some currency risk, political risk, and economic risk, but stressed the diversified operations that mitigated the effects of those risks in any particular country. Ex. 513 at 8748. The only apparently non-public information provided was that AES's internal projections exceeded Wall Street analysts' expectations for earnings over the period the transaction was likely to be pending. *Id.*; Tr. 692 (Brehm). The board concluded unanimously that the AES share exchange was the best available course for IPALCO shareholders, including the choice of no transaction.

VIII.   *Plaintiffs' View of AES*

Plaintiffs offered the testimony of John Guy, a successful and respected investment advisor in Indianapolis. He has some experience in evaluating investments in utility stocks, but he did not claim any special expertise in the

utility or electric industries.  With the benefit of hindsight, of course, it is clear that Mr. Guy made the right call about AES stock.  In June 2001, he spent about an hour looking at AES stock and its prospects.  He quickly concluded that the stock was very risky and immediately sold all of his clients' AES stock.  He did this several months before the most dramatic price drops, though after the price had dropped about one-third from its recent high.  Tr. 392-94, 397.

Mr. Guy testified that it was not prudent, after announcement of the AES deal, for the Thrift Plan to allow investment in IPALCO and then AES.  At trial, he testified about a comparison of AES and IPALCO as of July 2000.  See Ex. 902.  His view was that AES was then a high risk stock and IPALCO a low risk stock.  He based this evaluation on a comparison of a number of factors.  IPALCO's interest coverage was 4.6, compared to AES's 2.1.  The average annual price to earnings ratio for IPALCO was 14.7, compared to 27.2 for AES, presumably over the same time period.  The relative price to earnings ratio for IPALCO was 0.83 and for AES 1.57.  A major rating service rated IPALCO's financial strength as "A+" and AES's as "C++."  An overall assessment of risk by Standard & Poor's Stock Report rated IPALCO as low risk and AES as average.  The yield for IPALCO was 3.1 percent; AES paid no dividends.  The price to earnings ratio based on 2000 estimated earnings was 9.4 for IPALCO and 32.2 for AES.  Tangible book value per share was $7.75 for IPALCO and only $3.88 for AES.  The Beta, which Mr. Guy described as a "controversial" measure of volatility, was 0.15 for IPALCO and 1.47 for AES for the periods he considered.  He also found that IPALCO had lower long-

term debt, higher return on assets, and higher return on equity.  Mr. Guy also believed that it was probably difficult to manage well the AES assets all over the world, and he believed that a change in AES's business plan away from internal growth and toward growth by acquisition reflected additional risk.  Tr. 374-75.

Mr. Guy believed IPALCO remained a low risk company as a small electric utility.  He discounted any risk associated with deregulation because he expected those risks to affect all similar companies, "like the weather."  Tr. 378, 443-44. That discount of risk is not persuasive to the court.  The weight of more credible evidence, both directly from witnesses with substantial expertise in the industry and in documents reflecting the views of other experts in the industry, was that deregulation covered a wide range of different types of legislation and industry restructuring.  Different electric companies faced widely varying potential effects. See, *e.g.*, Tr. 734 (Holstein).

The most significant flaw in Mr. Guy's opinion is that he assumed in effect that IPALCO had the option of simply remaining as it was in 1997 or 1998, in his terms, that "jewel of a small company."  He discounted the risk of deregulation of prices and increased environmental regulation, and he did not consider the risk that a consolidating industry might drive the stock price back down, way below even its poor performance in 1999.  See Tr. 430-39.

The most appealing aspect of Mr. Guy's opinion, of course, is that he made the right call back in June 2001, independent of litigation.  Hindsight shows that if the Pension Committee had made the same judgment before March 2001, the plaintiffs might have avoided the losses they suffered (and other investors would have suffered the losses instead).  That is not the fair way to evaluate these events.  Mr. Guy based his opinions on public information about both AES and IPALCO.  Tr. 398.  All of that information was available to investors in an efficient market.  Both Mr. Guy and Dr. Burton Malkiel, defendants' expert on financial markets, agreed that one cannot reliably predict stock prices.  Tr. 418-21, 973-74.  There is no reason to think that the price of AES stock did not accurately reflect the market's valuation of the company's prospects at relevant times.

Even more to the point, defendants had no reason to expect the later decline of AES stock.  Where Mr. Guy saw danger, other investors saw opportunity.  That is always the case in an efficient market.  Someone will be right and someone will be wrong.  There was no particular reason why the IPALCO board or officers or the Pension Committee should have foreseen what other investors also did not foresee – that AES stock prices would fall so sharply several months after the IPALCO deal closed.  There is no proof here that any of these defendants had negative insider knowledge about AES.  Defendants saw a large, profitable company whose stock price had done well in recent years.  The stock was obviously a highly liquid asset.  Any IPALCO shareholder who preferred cash stock could easily sell the AES stock at any time.

To rebut Mr. Guy's testimony, defendants offered the testimony of Dr. Burton Malkiel, a prominent economist who is a former chairman of the Economics Department of Princeton University, a former member of the President's Council of Economic Advisers, and a former dean of the Yale School of Management. Dr. Malkiel also has extensive experience in determining investment strategies for a major mutual fund company and a major insurance company. Dr. Malkiel even had experience as a board member of a relatively small public utility (a regional telephone company) as it made the transition from a regulated industry to a more competitive one. Dr. Malkiel has substantial expertise in capital markets and portfolio management.

Dr. Malkiel is best known for his book "A Random Walk Down Wall Street," which argues persuasively that in efficient stock markets, a person without inside information is highly unlikely to be able to select stocks that will out-perform the whole market over time. The reason is that in efficient stock markets, the market will quickly, almost instantly, process public information about a company's prospects so that all the relevant public information will be reflected in the stock price at any given time. Under Dr. Malkiel's approach, the market price of a stock results from the interaction of those like Mr. Guy who see great risk and want to sell shares and others who see opportunity and want to buy shares.

Under these conditions, which applied to AES stock in 2000 and 2001, there is no reliable basis at any given time for believing that the current price will

go up or down. Under these conditions, there was certainly no basis for requiring a group of fiduciaries who had no inside information about AES to act on the assumption that AES stock was overvalued in late 2000 or early 2001. The Seventh Circuit adopted this reasoning in *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 408 (7th Cir. 2006) (holding that ERISA trustee could rely on pricing through major stock market for the best estimate of the current value of a stock at any given time, and citing work of Dr. Malkiel: "neither fiduciary was required to act on the assumption that the market was overvaluing United"); see also *id.* at 412 (expert's proffered testimony that fiduciary should have expected stock price to continue falling amounted to testimony that fiduciary should have "outsmarted the market" and did not present viable theory of breach of ERISA fiduciary duties).

Dr. Malkiel testified that AES was a prudent investment for the Thrift Plan in 2000 and early 2001, based on information available at the time, without the benefit of hindsight. In reaching that conclusion, he relied on the size and diversity of AES's business, which tended to reduce risk. He also considered the AES business model, its debt and its reliance on project-specific debt, as well as the company's earnings history, its historical stock performance, and its historical price/earnings ratio. He considered industry trends. He considered the fact that more than 70 percent of AES stock was held by sophisticated institutional investors, including one mutual fund family that has seemed to be an exception to the "Random Walk" thesis and has consistently been able to out-perform the

market.  Tr. 972-73.  Dr. Malkiel found no evidence available in the spring of 2001 that AES was in danger of bankruptcy or even of a significant slide in its stock price.  Tr. 973.  In comparing investments in AES and IPALCO, he concluded that at the relevant times, AES was probably a more prudent investment than IPALCO, primarily because of the greater size and diversification of AES, especially in light of the industry trend toward deregulation at the time.  Tr. 974.  Dr. Malkiel was the rare expert witness whose testimony was credible and persuasive in essentially all respects, and which was consistent with his well-regarded economic research. For the reasons discussed, the court credits Dr. Malkiel's opinions.

IX.    *The Individual Defendants' Interests in the AES Deal*

Plaintiffs base their claims most heavily on the theories (a) that the individual defendants faced a conflict of interest between their self-interest and the interests of the Thrift Plan members and other IPALCO shareholders, and (b) that the defendants had an obligation to disclose to Thrift Plan members the defendants' own decisions to sell all or nearly all of their personal holdings in IPALCO stock either before the AES acquisition or as soon as possible afterwards. The court is not persuaded, in the end, that most defendants' personal interests actually favored the AES deal or that the defendants had an obligation to make disclosures of their personal transactions beyond those required under federal securities law.  Because the law in this field is not well-defined and a reviewing court might disagree, however, a detailed account of the relevant facts is appropriate.

A.    *Termination Benefit Agreements*

Beginning at least as early as 1989, IPALCO's senior executives entered into "Termination Benefit Agreements" ("TBAs") with the company.  The individual defendants – Hodowal, Humke, Tabler, Califar, Plunkett and Steiner – were parties to such TBAs that were triggered by the AES transaction.  See Ex. 67.  The most relevant provision of the TBAs was that in the event that the executive lost his job within three years after a change in control of IPALCO, the executive would receive a lump-sum payment of 2.9999 times the average compensation reported on the federal W-2 form over the last five calendar years.

The proxy statement reported that the following executives would receive the following amounts under their TBAs assuming that the AES transaction closed on January 1, 2001.

| | |
|---|---|
| John Hodowal | $15,730,000 |
| Ramon L. Humke | $ 7,921,000 |
| John R. Brehm | $ 4,157,000 |
| Bryan G. Tabler | $ 1,954,000 |
| Joseph A. Gustin | $ 1,447,000 |
| Total of all officers with TBAs | $46,331,000 |

Ex. 51 at 14807.  Those figures were actually low because they did not take into account the exercises of stock options after September 7, 2000, which had the effect of raising the average compensation of the executives for the past five

calendar years.  The proxy statement noted this qualification but did not quantify the effect, since it was prepared as of September 8, 2000.  *Id.* at 14806-07.  The final total for all executives with TBAs was between $57 million and $60 million.

Hodowal, Humke, Tabler and other officers and directors were also entitled to deferred compensation totaling, for the group, $3,152,503.  Hodowal had the largest amount, $1,334,733.  Ex. 51 at 14807-08.  The proxy statement reported that all of these arrangements provided the beneficiaries with:

> interests in the share exchange that differ from those of IPALCO's shareholders.  The IPALCO board was aware of these agreements and arrangements during its deliberations of the merits of the share exchange and in determining to recommend to the shareholders of IPALCO that they vote for the proposal to adopt the share exchange agreement.

Ex. 51 at 14806.

The TBAs were intended to address a tension inherent in a decision to change the control of a corporation.  At the simplest level, shareholders have an interest in maximizing the value of their shares.  Senior corporate executives often expect to lose good jobs if there is a change of control.  There is always a risk that incumbent executives will try to protect their jobs by resisting a proposed transaction that would actually benefit all other shareholders.  See generally *Gerow v. Rohm & Haas Co.*, 308 F.3d 721, 723 (7th Cir. 2002) (explaining how such agreements can benefit shareholders by overcoming such resistance).  TBAs should be designed, at least in an ideal world, to encourage incumbent executives to focus their attention on the interests of shareholders and other constituencies

without having to worry too much about their own livelihoods. See Tr. 824 (Humke). The TBAs gave the IPALCO executives a promise of three years of salary in the event that they lost their jobs. After all, the "T" in TBA stands for "Termination."

The actual effects of the TBAs in this case were more complex because the transaction affected different individuals in different ways. Defendant Bryan Tabler testified that the day the AES transaction closed was the saddest day of his life. He was losing the best job he had ever had. The court credits that testimony. Similarly, John Brehm and Max Califar testified that they expected never to have such good jobs again. The weight of evidence indicates that the individual defendants were reluctant to recommend or approve of the AES purchase, which would bring an end to IPALCO's independence and force them out of jobs they found satisfying. They were persuaded in the end, or at least they accepted what they believed was the best alternative for shareholders. The prediction about what was the best alternative for shareholders looks disastrous with the benefit of hindsight, and without knowing what might have been different without the AES transaction. Nevertheless, based on the information available to the individual defendants at the time, the transaction looked good for IPALCO shareholders and less good for these individual defendants who were losing jobs prematurely, but for whom the blow was cushioned by large sums of cash.[11]

---

[11]Some of the testimony on these points was "volunteered" during plaintiff's direct but adverse examination of the defendants. Plaintiffs' counsel occasionally
(continued...)

John Hodowal and Ramon Humke present a different situation. Hodowal had hoped to retire in 2000. Humke was nearing retirement in any event. It is not obvious that their TBAs served the usual function for them, at least to the usual degree. If Hodowal had simply retired, he would have left IPALCO with a generous retirement pension and a substantial portfolio of IPALCO stock. He would not have received the nearly $19 million he received under the TBA (after boosting the TBA payments by exercising stock options in late 2000). Similarly, COO Humke was nearing retirement from IPALCO. He would have been able to retire with a generous pension and many shares of IPALCO stock, but without the millions he received under the TBA.

As the IPALCO board was considering the company's future, one board member raised an issue about Hodowal's interest in such a transaction. In response, both Hodowal and Humke gave the IPALCO board undated but signed letters of resignation. See Ex. 264; Tr. 145-46 (Hodowal), 755-56 (Tabler), 755-56 (Humke). At any time, the board could have accepted those letters of resignation. The effect would have been to nullify the lucrative TBAs for both Hodowal and Humke. The IPALCO board never took that step. The board apparently retained confidence in both Hodowal and Humke. Hodowal and Humke also both informed

---

[11](...continued)

moved to strike such volunteered remarks. The court chose not to strike them. In weighing the testimony, the court has not given weight to the volunteer context. If the comments had not been volunteered during plaintiffs' examination, they would have been made during the defendants' examination of the witnesses. Also, it is not surprising that the individual defendants were prepared to testify and impatient to rebut the attacks on their integrity in this case.

the board that they would be willing to stay at IPALCO if the board chose a course that called for them to do so, either through no deal or through a deal with a buyer who wanted one or both to stay to manage the company.

Defendants argued that their tender of those resignation letters shows that Hodowal and Humke were not trying to push a sale for their personal benefit. Plaintiffs must argue in response that the letters were a bold bluff by two executives who were plotting to enrich themselves. Perhaps, but the more reasonable inference is that both men, who had dedicated all (Hodowal) or a good part (Humke) of their careers to IPALCO, were acting in what they viewed as shareholders' best interests. That did not mean they were blind to their own personal interests, but it is hard to imagine any human being who might have been able to forget about his own situation under the circumstances. The court finds that both Hodowal and Humke honestly and reasonably believed the AES transaction was the best available course for IPALCO, its shareholders, and its employees.

B.    *Stock Sales by Defendants and Other IPALCO Insiders*

The centerpiece of plaintiffs' case here is the pattern of IPALCO stock sales by the individual defendants. All sold all or nearly all of their IPALCO stock after agreeing to the AES purchase, as detailed below. With two exceptions (Humke kept a substantial investment in AES, and Califar kept a relatively modest investment in AES), these individual defendants did not suffer the 80 to 90

percent erosion in their investments that the plaintiffs experienced after their IPALCO stock in the Thrift Plan was converted to AES stock.

Many of the stock sales in question were "cashless" exercises of stock options that IPALCO had granted to the senior officers.  The options were exercised by first buying IPALCO stock at the option price and then immediately selling the stock on the open market.  The sale proceeds were then used to repay IPALCO for the cost of buying the stock.  The difference between market price and option price was the profit, treated as ordinary income for the officer.  (The vast majority of the relevant stock options were "non-qualifying" for federal income tax purposes.)

The court generally agrees with defendants that the second half of such a cashless transaction, the sale of the newly purchased shares, reflects nothing about the executive's view of the company's prospects.  Plaintiffs pointed out correctly that the individual defendants all had the choice of exercising the options without selling the stock they received.  That approach to the non-qualifying stock options would have resulted in realized ordinary income, thus boosting the basis for the TBAs.  See Ex. 232 at 5756, 5760-61 (summary of advice given to IPALCO executives).  The sums were large enough that even the prosperous defendants were not in a position to exercise their options and to keep the stock, covering the cost of exercising the options with readily available cash.  Plaintiffs pointed out correctly that a defendant who was exercising stock options could have sold a

majority of the shares to cover the exercise price and retained a portion of the shares for future investment.

Even if one disregards the exercise of the stock options, there is certainly a pattern here.  Several defendants and other executives and directors exercised stock options in August 2000, just a few days after a special seminar on financial planning for IPALCO executives who would be affected by the AES acquisition. Trading by executives and directors was blocked for several weeks while the SEC was reviewing the draft proxy statement.  On September 7, 2000, IPALCO General Counsel Tabler notified officers and directors that the proxy statement had been finalized and was being made public, so that beginning on September 8th, they were no longer barred from trading in IPALCO stock.  The defendants immediately resumed exercising their stock options and selling their shares.

On September 8, 2000, the first day that the "window" opened, defendant and CEO Hodowal exercised all available options on 615,000 shares in a cashless transaction.  The market value of those shares was $14,221,875, and the profit to Hodowal was $4,104,425.  Ex. 581.  Hodowal sold all of the IPALCO shares in his Thrift Plan account on December 14, 2000.  The total was 67,181.9 shares for a net price of $1,589,417.  On January 4, 2001, he sold an additional 87,076 shares he had acquired between 1988 and 2000, for a net price of $2,078,940. On January 16, 2001, certain restrictions on further sales were lifted, and on January 23, 2001, Hodowal sold 33,094 shares of IPALCO stock for a net price of

$800,461.  See Ex. 906, summarizing information in Ex. 65.  Hodowal later sold the employer "new match" shares in the Thrift Plan as soon as he could, and he sold every other share that had converted to AES in June 2001 as soon as all restrictions on his sales were lifted.  Tr. 98-101.

Hodowal testified that he was selling all equity holdings on the advice of his personal financial adviser.  Despite plaintiffs' skepticism, the court sees no persuasive reason to discredit that testimony.  Hodowal had been an insider with IPALCO, but the AES deal put a cap (of $25.00 per share) on the value of IPALCO stock.  See Tr. 743 (Holstein, explaining that AES deal effectively capped growth in value of IPALCO stock).  When the AES deal closed, Hodowal gave up his job, and he was never an insider with respect to AES.

Defendant and COO Ramon Humke exercised his stock options in a series of cashless transactions beginning on September 8, 2000 and ending on December 4, 2000, for a total of 310,000 shares.  The market values for those shares totaled $8,905,821, and Humke realized a profit of $3,306,200.  Humke did not exercise options for an additional 330,000 shares because he was concerned about violating the terms of the options if the AES deal did not close as expected.  Tr. 791-92.  Those options converted to options on AES stock on terms that left them "out of the money" as a result of the later decline in AES share price.  Humke sold 24,016 shares of IPALCO stock on January 17, 2001, after some applicable restrictions were lifted the day before, for a net price of $585,390.

On February 13, 2001, he sold the IPALCO shares in his Thrift Plan account that he could, 19,517 shares for $471,441.  Humke retained approximately 78,000 AES shares after the deal closed, and he retained those shares at least through the date of the trial.

Defendant Tabler exercised his stock options in a series of transactions on August 23, 24, 25, and September 8, 2000.  These totaled 170,000 shares that had a total market value of $3,962,433, and he realized a profit of $1,223,133 on those shares.  Tabler sold all IPALCO shares in his Thrift Plan account on November 30, 2000:  3,355 shares for a net price of $78,061.  On the same day, he sold 12,802 shares he held directly, for a net price of $297,645.  On December 6, 2000, he sold another 27,117 shares he held directly for a net price of $640,645.  On January 18, 2001, two days after the restrictions were lifted, Tabler sold 5,659 shares he held directly, for a net price of $137,938.  Tabler retained some IPALCO shares that converted to AES shares that he could not sell until June 2001, and he sold those as soon as he could.

Tabler testified that he was acting on the advice of his personal financial advisor.  He no longer recalled the specific reasons for the advice, but the court credits the testimony.  Like Hodowal, he had been an insider with IPALCO, but everyone knew after the AES deal was announced that IPALCO shares were going to be worth about $25.00 when the deal closed, and no more.  When the AES deal

-61-

closed, Tabler gave up his job, and he too was never an insider with respect to AES.

Defendant Max Califar exercised stock options on August 18, 2000 and September 8, 2000 on 115,000 shares, for a total market value of $2,659,375. Califar realized a profit of $801,025 on those options.  Califar also sold 6,851 shares of IPALCO stock that he held directly on January 17, 2001, one day after the restrictions were lifted.  The net price to Califar was $166,565.  In June 2001, Califar sold most of the employer match in his personal Thrift Plan account, which was then held as AES stock.  He retained approximately $40,000 worth of AES shares.  Those shares were worth about $17,000 at the time of trial.

Defendant Stephen Plunkett exercised options on a total of 25,000 shares in two transactions, on August 14, 2000 and on September 8, 2000.  The market value of those shares was $539,760, and Plunkett realized a profit of $174,510. Plunkett also sold all of the IPALCO shares in his Thrift Plan account on January 5, 2001:  9,826 shares for a total price of $235,623.

Nine of the outside directors also sold all of their IPALCO stock before the AES deal closed.[12]  The members of the IPALCO "due diligence" team that studied

---

[12]One of those was Mr. Daniels, who sold his IPALCO stock as part of a much larger effort to restructure his personal portfolio to avoid conflicts of interest that might otherwise have arisen under federal law as he accepted the President's appointment as Director of the Office of Management and Budget.  Mr. Daniels'
(continued...)

AES also exercised all or nearly all available stock options and sold all or nearly all of their IPALCO stock, both in the Thrift Plan and owned directly, either before the closing or sold shares that converted to AES as soon as they could.  (Brehm held 10,000 shares of AES stock until sometime in 2002.)  These persons included John Brehm, Michael Holstein, Michael Banta, and Daniel Short.  All of these individuals also had TBAs and lost their jobs when the AES deal closed.

All of the sales and exercises of options by IPALCO executives and directors were obviously linked to the AES acquisition and the fact that these executives and directors were very likely or even certain to lose their positions with IPALCO.  The IPALCO executives and directors did not have any pattern of prior significant sales of IPALCO shares.

In light of all the rhetoric in this case about "insider" sales and the connotations it carries, the court must point out that the individual defendants and all other IPALCO executives and directors were not *AES insiders*.  There is no evidence that they had access to any material, negative, non-public information about AES at any time.  There is evidence that the due diligence team examined AES's internal projections just before the July 14, 2000 board meeting and

---

[12](...continued)
sale under those circumstances does not support any adverse inferences about his intentions or his views of AES's prospects.

The other outside directors who sold their IPALCO stock and exercised available IPALCO stock options were Joseph Barnette, Rexford Early, Otto Frenzel, Max Gibson, Ben Lytle, Michael Maurer, Sallie Rowland, and Thomas Sams.

concluded that the projections were at least consistent with estimates published by Wall Street analysts.  There is no evidence that the defendants or other IPALCO officers or directors were aware of any material non-public information suggesting that AES stock prices were likely to fall a year after the first agreement or several months after the closing.

C.   *Disclosure of IPALCO Insider Transactions*

All of the sales and exercises of options by senior executives and directors of IPALCO were reported to the Securities and Exchange Commission and were publicly disclosed.  See Ex. 65 (SEC Form 144's).  The transactions were reported in a daily newspaper of general circulation (The Indianapolis Star) and a weekly business publication (The Indianapolis Business Journal) approximately five weeks after the transactions.  See Exs. 549, 552.  The transactions attracted enough attention so that during the October 20, 2000 special shareholder meeting to vote on the AES deal, at least two opponents of the deal mentioned the IPALCO officers' sales of their stock.  Ex. 193.  On November 21, 2000, the Indianapolis Business Journal ran a front-page article with the headline "IPALCO execs will lose jobs," and reported on the TBAs.  Ex. 516 at 71275.  On December 17, 2000, the IBJ ran another front-page article with the headline "IPALCO execs cash out on options."  Ex. 516 at 71278.  The proxy statement provided detailed information about the TBAs and other deferred compensation and restricted stock grants for the IPALCO officers.  A reader of the proxy statement should not have been surprised to learn of the later exercises of stock options.

The IPALCO executives' sales were not reported directly to Thrift Plan participants and beneficiaries. The record of the special shareholder meeting shows that least some plaintiff class members (including Mr. Wycoff) learned of the defendants' transactions prior to October 20, 2000. Ex. 193. There is no other evidence that any plaintiff class members actually learned of the transactions at the relevant times. Plaintiffs do not claim that there were any violations of securities laws relating to these transactions.

There is no evidence that the public disclosure of these transactions to the securities market caused any change in the price of IPALCO or AES shares. The combination of public reporting of the transactions and the absence of any effect on share prices is consistent with defendants' argument that there is nothing unusual about sales by company insiders in connection with their departures from a company, as courts have repeatedly recognized in securities fraud cases. See *In re K-Tel Int'l, Inc. Securities Litig.*, 300 F.3d 881, 896 (8th Cir. 2002) (sales in connection with executive's resignation did not support inference of fraudulent intent); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) ("not unusual" for persons leaving a company to sell their shares); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (sales by one executive when he resigned did not support inference of fraudulent intent); *In re First Union Corp. Securities Litig.*, 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001) (same).

Plaintiffs have interpreted some testimony by Humke and Califar as confessions of a deliberate effort to conceal their stock sales. Humke was asked whether he disclosed his stock sales to plan participants other than by signing and filing the SEC disclosure forms. His answer was:

> No. All of my experience involving activities like the Thrift Plan would indicate that one needs to be very cautious about not giving investment advice without the appropriate qualifications. And we did provide advisors to our Thrift Plan participants for that purpose.
>
> In addition, seems to me that if I were to advise people that I was selling options or shares or whatever the case may be, it could very well be misconstrued as an opinion as to the regard of the future viability of the stock; and that was not the case.
>
> These transactions were done for reasons totally apart from the prospects that I believed to be the case with AES. And so to have talked about them excessively could have well produced an incorrect assumption.

Tr. 794. Califar said that he did not make any further disclosure for similar reasons, a concern that participants might be misled if he made further disclosures. Tr. 907.

The court credits this testimony from Humke and Califar, and does not draw the negative conclusions that plaintiffs advocate. Neither Humke nor Califar had any reason to expect a dramatic drop in AES stock price. Both were cautious about taking actions that might be misinterpreted as giving investment advice they were not qualified or willing to give. Such caution is understandable, both in human terms and in terms of potential exposure to legal liability for giving improper advice they were not qualified to give.

Plaintiffs also contended that Hodowal deliberately misled them at the October 20, 2000 shareholder meeting when he was asked twice about his and other officers' exercise of stock options.  He responded by stating that executives with TBAs would have a choice between leaving the company with a "three year payment" or staying with the company.  Ex. 193; Tr. 111-12.  He pointed out that executives would be subject to blackout periods when they could not trade in IPALCO or AES stock.  He went on to say that the options had to be exercised or they would be lost.  That last comment was incorrect, as Hodowal conceded at trial.  Tr. 113.  An executive who failed to exercise an option would lose the ability to include the profit from the stock option in the calculation of his benefits under the TBA, but an IPALCO stock option that was not exercised was converted to an option to buy AES stock based on the share exchange ratio.  See Ex. 51 at 14808 (proxy statement).

The court does not draw an inference of intent to mislead from this wrong answer.  The correct answer was spelled out in proxy statement.  Hodowal got the details wrong in his oral answer, but he got the gist right:  the executives would be losing their jobs, and it was in their best interests to exercise the options while they still could.  The difference between the details of the correct written answer in the proxy statement and the incorrect oral answer in the meeting is not so material as to persuade the court that Hodowal was trying to mislead shareholders or Plan participants.  He had years of experience leading a public company and knew that his and other executives' personal financial transactions

in the stock were all public.  It is not at all likely that he was intentionally trying to mislead shareholders or Plan participants by contradicting the proxy statement on this detail.

X.    *Disclosures to Thrift Plan Participants*

The proxy statement provided to all shareholders in September 2000 contained information relevant to AES and its stock.  The proxy statement provided high and low stock prices for both AES and IPALCO for each quarter for the past two and a half years and reported that AES had not paid dividends since December 1993.  The proxy statement also provided key financial data for both AES and IPALCO.  Ex. 51 at 14785-90.

In a discussion of IPALCO's reasons for the transaction, the proxy statement included at page 22 the heading "AES has significant resources and a strong reputation."  Ex. 51 at 14798.  Under that heading, IPALCO identified as a potential risk the following:

> The fact that the market price of AES common stock has been relatively volatile, presenting some risk to IPALCO shareholders that the value of AES common stock received in the share exchange will be less than $25.00.  The IPALCO board also considered the fact that the share exchange agreement provides that the value of the exchange ratio to IPALCO shareholders is fixed at $25.00 per share of IPALCO common stock unless the average trading price (as determined in accordance with the share exchange agreement) of the AES common stock is below $31.50, as well as the fact that IPALCO may terminate the share exchange agreement in the event that the value of the exchange ratio to IPALCO shareholders falls below $21.00 per share of IPALCO common stock.

*Id.* at 14798-99.

Mr. Guy was also highly critical of the proxy statement and its information about any risk associated with AES:

> This is a case where too much disclosure is no disclosure. I had trouble reading it. Even today I couldn't articulate the details of it. There were countless notes. It was all small print. I think the balance sheet had about 50 or 60 lines on the page. It was no disclosure at all. It just wasn't there.

Tr. 381. Mr. Guy criticized the Pension Committee for failing to take more pro-active steps to communicate to Thrift Plan participants and beneficiaries the risks associated with AES. He also criticized the failure to disclose to Thrift Plan members the sales of stock, especially those held in the Thrift Plan itself, by Pension Committee members. For reasons explained below, the court does not accept those criticisms.

XI.   *Financial and Investment Advice*

A.   *The Country Club Advice Session for Executives*

On August 14, 2000, Hodowal and Humke arranged for an IPALCO-sponsored financial advice seminar for its officers and some other senior executives at the Twin Lakes Country Club in Indianapolis. Consultants from a major accounting firm provided advice about decisions that would need to be made in connection with the AES purchase of IPALCO. See Ex. 32. The consultants had a detailed understanding of the AES transaction, SEC pooling

-69-

restrictions on stock sales, the TBAs, stock options, and other employee benefits that would be affected by the transaction.

The consultants explained how to maximize TBA benefits by exercising stock options and otherwise accelerating income to 2000 so as to boost the five-year average of compensation used to calculate the TBA benefits. The consultants provided helpful tax advice. (That advice included that the exercise of most of the stock options, those treated as "non-qualifying" for tax purposes, would trigger ordinary income regardless of whether the executive also immediately sold the stock. Ex. 32 at 5756.) The consultants addressed a host of questions: whether to diversify plan assets, whether to maintain investments that would become AES holdings or to diversify, and numerous questions about estate and gift tax issues and trust mechanisms for reducing taxes. The consultants also offered advice on management of investments. Not surprisingly, one of the main messages of the consultants was the value of diversified investments, though the application of that general rule to stock options and certain restricted stocks could be considerably more complex for some executives as a result of tax issues that did not apply to Thrift Plan participants.

B.    *Merrill Lynch Advisers for Plaintiffs*

In connection with the Thrift Plan, Merrill Lynch continued to conduct regular meetings for investor education and investment advice for Thrift Plan participants. After the announcement of the AES deal, that practice continued.

Merrill Lynch made presentations to Thrift Plan members to address investment choices as the closing date approached.  Tr. 896, 927-30 (Califar).  Also, the Merrill Lynch personnel remained available to provide financial planning advice to Thrift Plan members.  As far as the evidence shows here, the available advice was competent and appropriate.


XII.    *Pension Committee Considerations*

On September 29, 2000, the Pension Committee held a meeting to consider how to vote the IPALCO shares held in the Thrift Plan.  The Pension Committee voted to instruct the trustee (Merrill Lynch) to vote the shares in favor of the transaction.  Ex. 189.  The minutes of the meeting stated that chairman Tabler reviewed the matter with the committee and that the committee "considered this matter carefully."  *Id.*  The resolution stated that the committee had considered the best interests of Thrift Plan beneficiaries, the fairness opinion of the investment bankers appended to the proxy statement, and "such other matters as it deems necessary for the purpose."  There is no other documentation of this decision.  However, Pension Committee chairman Tabler had been intimately involved in the IPALCO board's process of education about IPALCO's prospects and the process that led to the decision to sell to AES.  Califar's role in the AES deal had been more limited, but he was certainly aware of the major developments and issues.  Hodowal was an *ex officio* member of the Pension Committee but recalled attending only one committee meeting after he became CEO.  Humke also

was an *ex officio* member.  He rarely attended meetings but reviewed minutes and reports on investment performance.

In voting on the share exchange agreement, the Pension Committee reviewed the proxy statement.  Tabler honestly and reasonably believed that the AES deal was a better prospect for IPALCO shareholders, including Thrift Plan participants, than other options available to the company, including remaining independent.  Tabler did not believe that the AES deal was in his personal best interests.  He would have preferred to remain employed as a senior executive with an independent IPALCO.  The same was true of Califar.  There is no specific evidence about defendants Steiner and Plunkett.

The Pension Committee never actively considered whether to eliminate IPALCO or AES stock as an investment option for the Thrift Plan.  Tr. 906.  There is no evidence that the question even occurred to them.  If the question had occurred to them, the weight of evidence shows convincingly that they would not have decided to eliminate it and that they would have had sound reasons for that decision.  During the period that these defendants were members of the Pension Committee, there were no meaningful trouble signs suggesting that AES stock was likely to head in the wrong direction.  From the perspective of the fall and winter of 2000-01, IPALCO stock was going to be converted at a reasonable premium for stock in a large, growing, highly successful, and profitable company with stock that was readily marketable.  The court credits the opinion of Dr. Malkiel that,

without the benefit of hindsight, continued investment in IPALCO and then AES remained a reasonable and prudent investment for the Thrift Plan.  Continued investment was consistent with the specific terms of the Plan (see Ex. 94, § 301.170 and § 101.190, treating Fund B as common stock of IPALCO or any successor) and with its more general purposes, which included allowing and encouraging such investment in the employer.  To the extent that plaintiffs rely on Mr. Guy's opinion about the risk that AES would decline, recall that there was a buyer for every one of the shares that Mr. Guy arranged to sell in June 2001, three months after the closing.  Hindsight shows that Mr. Guy was right and the buyers were wrong about the price of AES stock over the next several years, but there was no reliable way to know that at the time.

On January 16, 2001, IPALCO amended the Thrift Plan so as to transform Fund B from IPALCO stock into AES stock upon consummation of the planned share exchange.  Hodowal signed the document in his capacity as president of Indianapolis Power & Light Company, the sponsor of the Thrift Plan.  The amendment modified the definition of "Common Stock" in Section 301.170 of the Thrift Plan to read:  "The term 'Common Stock' means the common capital stock of [IPALCO] Enterprises; provided, however, that effective, and conditioned, upon the consummation of the Agreement and Plan of Share Exchange between IPALCO Enterprises, Inc. and The AES Corporation, the term 'Common Stock' means the common capital stock of The AES Corporation."

XIII.    *The Closing and the Individual Defendants' Terminations*

All of the individual defendants in this case ended their employment with IPALCO on or about the date of closing, March 27, 2001.  None played any further role in administering or overseeing the Thrift Plan after that date.  That fact is relevant because of what happened to AES stock in a generally declining stock market.  The price was $49.60 on the date of closing.  A month later, it was $47.45.  Two months later, on May 29, 2001, it was $45.40.  Three months after closing, on June 27, 2001, it was $42.28.  See Ex. 89.  The decline became steeper in July, down to $37.30 on July 27, 2001.  By September 10, 2001, the price had declined to $29.00.  It declined to $24.25 by September 25, 2001, after the market interruptions resulting from the terrorist attacks on September 11th.  The next day, the bottom really dropped out, with a one-day decline of nearly 50 percent, down to $12.25.  AES stock recovered some of that loss over the winter, but in February 2002 dropped back below $13.00, reaching as low as $4.11 on February 21, 2002.  For these purposes, the important point is that, at least in the first three or four months after the individual defendants gave up all responsibility for the Thrift Plan, there was nothing unusual about the decline in AES stock price.  The proxy statement provided to IPALCO shareholders showed that in 1998 and 1999, the high and low prices during each year differed by a factor of more than two.  See Ex. 51 at 14785.

*Conclusions of Law*

I.   *Fiduciary Duties Under ERISA*

The court has jurisdiction over the parties and the subject matter of this action, which arises under federal law.  As members of the Pension Committee that administered the Thrift Plan, the individual defendants were fiduciaries under ERISA, at least to the extent they acted in their roles as members of the Pension Committee.  IPALCO was the parent company of the plan sponsor.  IPALCO itself did not hold a fiduciary position, but it could take on fiduciary roles to the extent it "exercise[d] any authority or control respecting management or disposition of [plan] assets."  29 U.S.C. § 1002(21)(A)(i).

The statutory language establishing fiduciary duties under ERISA provides in part:

> a fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and –
> (A)   for the exclusive purpose of:
>    (i)   providing benefits to participants and their beneficiaries; and
>    (ii)   defraying reasonable expenses of administering the plan;
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> (D)   in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a).  These duties are rooted in the common law of trusts, though the Supreme Court has described the analogy as "problematic" because the common law assumes that a trustee "wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats." *Pegram v. Hedrich*, 530 U.S. 211, 225 (2000).  ERISA recognizes that a person who acts as an ERISA fiduciary may have financial interests adverse to beneficiaries, as long as the person acts only in the interests of beneficiaries when wearing the fiduciary hat.  *Id.*

The ERISA provision on fiduciary duties includes a requirement that the investments of plan assets be diversified.  29 U.S.C. § 1104(a)(1)(C).  The parties agree that the specific diversification requirement does not limit the Thrift Plan's ability to invest in employer stock because the Plan is an eligible individual account plan or "EIAP."  See 29 U.S.C. § 1002(34); § 1104(a)(2), 1107(b)(1), 1107(d)(3).  Nevertheless, the general fiduciary duties of loyalty and prudence under ERISA still apply to an EIAP.  *E.g.*, *Armstrong v. LaSalle Bank National Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006); *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2005).

When a plan provides for individual accounts and enables a participant or beneficiary to exercise control over the assets in his or her account, and if the plan also satisfies regulatory requirements established by the Secretary of Labor, ERISA also provides that a fiduciary shall not be liable for any loss or breach that

results from a plan participant's or beneficiary's exercise of control over the assets of an individual account.  29 U.S.C. § 1104(c)(1)(A).  The parties agree that the Thrift Plan did not comply with the detailed regulatory requirements needed to take advantage of that safe harbor.  See 29 C.F.R. § 2550.404c-1.  Outside the protection of that safe harbor in the case, the issue is whether the defendants complied with the general duties of loyalty and prudence under ERISA.  The absence of the safe harbor does not mean that defendants violated ERISA, and it does not relieve plaintiffs of their burden of proving a violation of fiduciary duty.  See *Jenkins v. Yager*, 444 F.3d 916, 924 (7th Cir. 2006).[13]

Plaintiffs contend that the defendants breached the ERISA fiduciary duties of loyalty and prudence in three principal ways.  First, plaintiffs contend that the defendants breached their duties by failing to remove IPALCO and then AES stock as investment options for Thrift Plan members.  Second, plaintiffs contend that the defendants breached their duties by promoting investments in IPALCO and AES and by failing to disclose their own sales of all or nearly all of their own IPALCO and AES stock.  Third, plaintiffs contend that defendants breached their

---

[13]Plaintiffs cite *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 578 (S.D. Tex. 2003), for the proposition that, if an EIAP does not meet the regulatory criteria under section 1104(c), "the fiduciaries retain liability for all investment decisions made by the Plan participants."  The *Enron* court did not cite authority on the point, and that court's view is contrary to the Seventh Circuit's decision in *Jenkins v. Yager*, which was following the directive of the applicable regulation, 29 C.F.R. § 2550.404c-1(a)(2), and 57 Fed. Reg. 46906, 46907 (Oct. 13, 1992) (final rule explaining that, "as previously explained, non-complying plans do not necessarily violate ERISA; non-compliance merely results in the plan not being accorded the statutory relief described in section 404(c)").

duties by allowing the employer matching contributions of IPALCO stock to be converted to AES stock upon closing.

II.    *Allowing Plaintiffs to Invest in IPALCO and then AES*

Before IPALCO and AES agreed to the share exchange, the Pension Committee members were complying with their fiduciary duties under ERISA. They had provided a diverse range of prudent investment choices for Plan participants and had arranged with Merrill Lynch to educate the participants about their choices and to provide individual advice about those choices. Plaintiffs do not contend there was any violation of ERISA prior to July 15, 2000.

The strongest form of plaintiffs' claims is that defendants were corrupt and dishonest:  that they decided to cash out for themselves through the AES deal, and that they deliberately misled the plaintiffs and mismanaged the Thrift Plan assets so as to help promote the AES deal for their own benefit.  The court's factual findings reject the premise of alleged dishonesty and selfishness.  The court finds that the individual defendants honestly and reasonably believed that the AES deal was in the best interests of IPALCO shareholders, including the Thrift Plan participants.

Plaintiffs argue that they do not need to show dishonesty to show a breach of the duties of loyalty and prudence.  They are right, at least in theory.  The test is an objective one.  Did the defendants, acting in their fiduciary capacities as

administrators of the Thrift Plan, act for the exclusive purpose of providing benefits to participants and their beneficiaries, and, in the statute's terms, "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"?  As found above, the defendants never considered the possibility of prohibiting plaintiffs from investing in IPALCO and AES.

The court has found that the Thrift Plan required the Pension Committee to maintain IPALCO stock as an option for participants' investments of their own contributions.  That finding is not necessarily the end of the story.  A number of court decisions have recognized, usually in *dicta*, at least a possibility that under sufficiently dire circumstances, ERISA fiduciaries' duty of prudence may require them to act contrary to the terms of a plan and to sell employer stock.  *E.g.*, *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 408 (7th Cir. 2006) (employer's stock dropped in value toward zero and bankruptcy); *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2005) (suggesting that duty of prudence might require diversification if plan participants were all close to retirement, plan assets were their principal retirement assets, and buyer's stock was much more volatile and bankruptcy risk was greater); *Moench v. Robertson*, 62 F.3d 553, 571-72 (3d Cir. 1995) (employer's stock slid toward zero, and insiders knew of impending collapse); *DiFelice v. US Airways, Inc.*, 397 F. Supp. 2d 758, 773-74 (E.D. Va. 2005) (employer's stock dropped toward zero and bankruptcy).

Assuming the theoretical possibility that a fiduciary might need to act contrary to the Plan's terms, at all times that the defendants in this case exercised authority over the Thrift Plan and its investments and investment options, both IPALCO and AES stock were reasonably healthy stocks. That fact weighs heavily against a finding of breach of fiduciary duty. See *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097-99 (9th Cir. 2004) (fiduciary did not violate duty by failing to sell employer stock in 401(k) plan in contravention of plan provisions where plaintiffs did not allege company was on brink of collapse); *Pedraza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1275-76 (N.D. Ga. 2006) (dismissing claim that fiduciaries should have acted contrary to plan provisions and sold employer stock in face of drop in price where company was not "on the brink of collapse," and recognizing that a "fiduciary who decides to scrap the ESOP is just as apt to be sued as he would be if he enforced the plan provisions").

The defendants in this case did not ever face decisions about what to do with Thrift Plan assets in a glide toward bankruptcy. Under these circumstances, the defendants probably would have violated their fiduciary duty to comply with the terms of the Plan itself if they had tried to eliminate the option of investing in IPALCO and then AES stock. Even if ERISA might have permitted them to take that step, they certainly were not required to do so. They did not violate their fiduciary duties by failing to eliminate that option.

The Seventh Circuit's opinion in *Steinman v. Hicks*, 352 F.3d 1101 (7th Cir. 2005), deserves more specific attention here.  In *Steinman*, an employer had established an employee stock ownership plan ("ESOP") to supplement its traditional pension plan.  The employer was acquired by a much larger corporation, Archer Daniels Midland, in a stock-for-stock exchange.  ADM decided to terminate the plan and to give participants a choice between taking an immediate distribution in the form of either cash or ADM stock, or rolling over their account into ADM's own ESOP or an individual retirement account.  Termination of the plan was delayed while ADM sought a favorable tax ruling.  During that time, the price of ADM stock fell by almost one-third.  352 F.3d at 1103-04.  Plan participants then alleged that the fiduciaries' failure to diversify the portfolio during the interim was a breach of fiduciary duty.

The Seventh Circuit affirmed summary judgment for the defendants.  The court recognized that the plan was exempt from the ERISA requirements for diversification of investments, to the extent that it invested in employer securities.  The court found that the fiduciaries were still subject to the more general duty of prudence under ERISA, but found no breach of that duty.  352 F.3d at 1106.  At the times the decisions were made, neither the fiduciaries nor anyone else could know what the future held for ADM stock.  *Id.* at 1104.  Similarly here, the fiduciaries here could not know, and had no convincing reason to expect, that AES stock would drop in the next year.

At the end of the opinion, the *Steinman* court hypothesized circumstances in which it might be a breach of fiduciary duty for administrators of an ESOP to keep the plan heavily invested in the employer's stock.  If (1) all the employees were old enough to retire in the very near future, if (2) the ESOP were their principal retirement asset, and if (3) the employer carried out a stock-for-stock exchange with a buyer whose stock carried much higher risks, then the fiduciaries might be required to diversify as a matter of prudence.  352 F.3d at 1106.  None of those conditions are satisfied in this case.  Plaintiffs attempted to show only the third point about higher risk with AES stock, but their evidence on that point was not persuasive.[14]

---

[14]A series of cases has debated (a) whether and when ERISA fiduciaries are entitled to a presumption they have acted reasonably by continuing to hold employer stock as the employer's bankruptcy and financial collapse were imminent, and (b) how such a presumption might be rebutted.  In *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995), the Third Circuit adopted a rebuttable presumption that a fiduciary of an ESOP who holds employer stock is entitled to a rebuttable presumption that he or she acted consistently with ERISA, and the decisions will be reviewed for abuse of discretion.  Accord, *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

In *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004), the Ninth Circuit concluded that the *Moench* presumption of reasonableness should also apply to an EIAP (eligible individual account plan) that was not an ESOP.  Although the Ninth Circuit did not "adopt wholesale the *Moench* standard," it reasoned that both ESOPs and EIAPs were exempt from the more general diversification requirements of ERISA.  360 F.3d at 1098 n.3.

(continued...)

With or without the presumption discussed in note 14, it is clear that the defendants here all viewed continued investments in IPALCO and AES as an appropriate and  suitable investment option for the Thrift Plan participants.  The defendants had reasonable grounds for that view, as detailed above, after going through the process that had led the IPALCO board to approve the AES share exchange.  There is no evidence that the Pension Committee formally considered the question or that it asked any outside adviser to provide an opinion on this

---

[14](...continued)
The Third Circuit itself has limited the *Moench* presumption of reasonableness, holding that it did not apply to an EIAP that did not require that one investment option be stock in the employer.  *In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231, 236-38 (3d Cir. 2005) (noting that plan "was not required to offer Schering-Plough stock as one of its investment opportunities"); cf. *DiFelice v. US Airways, Inc.*, 397 F. Supp. 2d 758, 762-63, 773 n.15 (E.D. Va. 2005) (citing *Schering-Plough*, concluding that *Moench* presumption did not apply to 401(k) plan that apparently did require that employer stock be one of the investment options, and denying summary judgment on claim for breach of fiduciary duty by failure to eliminate U.S. Air Group stock as investment option as stock prices dropped and airline eventually went into bankruptcy).

This court believes it would be reasonable to apply the *Moench* presumption here because the Thrift Plan required the fiduciaries to have IPALCO stock available as an investment option.  As the *Moench* court recognized, ERISA requires a fiduciary to comply with the written terms of the plan.  See 29 U.S.C. § 1104(a)(1)(D); *Moench*, 62 F.3d at 571-72 (courts applying presumption must recognize that fiduciary could also face liability for failing to maintain investments in employer securities); *Kuper*, 66 F.3d 1459 (agreeing on this point).  A fiduciary who invests plan assets in a way that is contrary to the written terms of a plan can be held liable for a breach of fiduciary duty.  See *California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001), citing *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241-42 (2d Cir. 1989).  Where the fiduciaries face liability in either direction, they are entitled to reasonable latitude.  See *Armstrong*, 446 F.3d at 733 ("We must not seat ESOP trustees on a razor's edge.  We agree therefore with those courts that review the ESOP trustee's balancing decision deferentially.").  But whether the presumption applies or not, the evidence here persuades the court that the defendants in this case acted reasonably.

question.  Nevertheless, the Pension Committee members were thoroughly familiar with IPALCO and had learned a great deal about AES.  Their opinions would not have led them to eliminate that choice.  And but for the 20/20 clarity of hindsight, their opinions should not have led them to eliminate the choice.

In response to these points, plaintiffs remind the court that the defendants sold most or all of their own IPALCO and then AES stock as soon as they could. As explained above, however, the defendants were losing their jobs at IPALCO and faced a range of prospects for their own futures.  It is not surprising that they chose to reduce or eliminate their personal investments in AES under those circumstances.  That is a far cry from a conclusion that the defendants should have prohibited Thrift Plan members from continuing to invest in IPALCO and then AES if they wished to do so.

After July 15, 2000, the defendants in this case knew a good deal about AES.  In particular, Pension Committee chairman Tabler had sat through nearly all of the board of directors meetings that led to the decision to enter into the share exchange.  He had heard and seen the information presented about AES and its prospects.  He had not only read but had also helped draft the proxy statement, with its detailed disclosures about both companies.  Tabler knew that AES stock had been very successful in recent years as the company had grown. He knew that its stock was widely traded and could readily be sold by anyone who wished to do so.  He knew that the company was large, with diversified activities

and risks.  He knew that AES stock was widely held by sophisticated institutional investors.  He had no non-public information indicating that AES stock was likely to decline in value.   He also knew that IPALCO faced significant risks for shareholders if it chose to remain independent.  He knew that a well-informed independent board of directors, after receiving expert advice from Warburg, from Goldman Sachs, and from able legal counsel, had reluctantly come to the conclusion that the deal was in the best interests of shareholders.  He knew that the board had received expert advice that the deal was fair to IPALCO shareholders.  He also knew that the Thrift Plan had always had as part of its purpose to encourage employee ownership of their employer.  In light of all that information, it was reasonable and prudent for the Thrift Plan, prior to the March 27, 2001 closing, to continue to allow participants to invest in IPALCO stock that would convert to AES stock upon closing.  That was also the persuasive view of Dr. Malkiel.

During the months between the first agreement and the closing, the Pension Committee did not undertake any formal review of the suitability of the investment options it provided to participants.  There is no formal report from an outside investment advisor during those months evaluating AES stock and concluding that it was a suitable investment option for the Thrift Plan.  That absence does not indicate that the Pension Committee was not paying attention to AES.  The court can reasonably infer from the evidence that the impending closing was *the* principal topic of discussion at IPALCO, including among senior executives like

the defendants who were likely or certain to lose their jobs upon closing, and to receive TBA benefits in the millions of dollars.

Even if plaintiffs had proved that the Pension Committee had failed to act prudently by failing to undertake a more formal review of the Thrift Plan's investment options between July 15, 2000 and March 27, 2001, defendants have shown by a preponderance of the evidence that such a review would not have resulted in removal of IPALCO/AES as investment options.  Again, the information known to the Pension Committee members showed that AES was a promising investment, and one that seemed less risky than IPALCO stock in the absence of the acquisition.  There was no apparent reason for the Pension Committee either to act contrary to the terms of the written plan by forcing Thrift Plan members to sell their IPALCO stock before closing or by prohibiting Thrift Plan members from continuing to purchase additional shares with each paycheck.[15]

In arguing a breach of a the fiduciary duty of loyalty and prudence, plaintiffs rely heavily on *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), and *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982), which both addressed ERISA's fiduciary duties as applied in hostile corporate takeovers.  In *Donovan v. Bierwirth*, the

_____

[15]As noted above, a fiduciary who invests plan assets in a way that is contrary to the written terms of a plan can be held liable for a breach of fiduciary duty.  See, *e.g., California Ironworkers Field Pension Trust v. Loomis Sayles & Co.,* 259 F.3d at 1042.  If a fiduciary could also be held liable for bad investment results from investing plan assets as required by the mandatory terms of a plan, there is a great risk that the fiduciary would become in effect a guarantor of good investment results.

Grumman Corporation's defined-benefit pension plan owned a large block of Grumman stock. The trustees of the plan were senior Grumman officers. LTV launched a hostile takeover attempt at Grumman. The trustees of the Grumman pension plan managed the plan's investments and voted the stock to attempt to block LTV's takeover attempt. See *Donovan v. Bierwirth*, 538 F. Supp. 463, 471-72 (E.D.N.Y. 1981) (district court finding that trustees' conduct "was solely motivated by their all-consuming desire to defeat the tender offer").

The Second Circuit found that the plan trustees faced substantial conflicts of interest because of their individual interests in resisting the takeover to preserve their own jobs. The Second Circuit took the approach that in that situation, the trustees either needed to step aside during the control contest or needed to conduct a thorough, careful, and impartial investigation focused on the best interests of the plan beneficiaries. 680 F.2d at 271-72, 276. As the Seventh Circuit described that holding in *Leigh v. Engle*: "Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." 727 F.2d at 125-26.

In *Leigh v. Engle*, the fiduciaries were on the other side of the takeover efforts. A group of investors had acquired a company called Reliable Manufacturing. Their control of the company gave them control of a profit sharing plan and its investments. The defendants used their control over the profit

sharing plan to invest in the targets of their next several hostile takeover attempts, putting the plan assets at risk in some highly speculative investments. The Seventh Circuit found that the plan fiduciaries acted in their own best interests by managing the investments to aid their other hostile takeover attempts. The court found that the defendants had violated their duty of loyalty. 727 F.2d at 128-29.

*Leigh* includes language and reasoning that support plaintiffs' claims here. The Seventh Circuit wrote: "Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." 727 F.2d at 125-26, citing *Donovan v. Bierwirth*. Here the evidence of the individual defendants' benefits from the AES acquisition made it at least possible for a reasonable outside observer to question their independence in making decisions affecting that transaction. The evidence also shows that the Pension Committee itself did not undertake "an intensive and scrupulous independent investigation" of the available choices.

The court is not persuaded, however, that *Leigh* requires a finding of liability in this case. Most important, the Seventh Circuit in *Leigh* eschewed bright-line rules and carefully evaluated the entire context of the transactions in question: "where plaintiff allege that fiduciaries have used plan assets for their own purposes in a corporate control contest, courts must examine closely the

circumstances surrounding the alleged use of plan assets." 727 F.2d at 127; accord, *Jenkins v. Yager*, 444 F.3d at 925 (adequacy of fiduciary's independent investigation must be evaluated in light of the character and aims of the particular benefit plan), quoting *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996).

The evidence in *Leigh* showed the repeated, systematic, and active use of plan assets to assist the group of defendants in their series of hostile takeovers of small publicly-traded corporations. The investments were highly speculative. See 727 F.2d at 119-21. The Seventh Circuit clearly concluded that it was necessary to raise substantial risks of liability for such dangerous and speculative uses of employee benefit plans for the benefit of the fiduciaries and their associates even when those uses turned out to be profitable. See *id.* at 132 (recognizing that benefit plans subject to ERISA controlled enormous pool of capital in 1984). The Seventh Circuit in *Leigh* and the Second Circuit in *Donovan v. Bierwirth* were also troubled by the risk that plan fiduciaries who were executives with takeover targets would use their control over plan assets to protect their jobs, at the expense of employee-shareholders who might benefit from the takeover. 727 F.2d at 127; 680 F.2d at 276.

The broader context in this case shows a very different picture. The individual defendants were not using plan assets to assist in some separate venture. The transaction here was not a hostile takeover that required the

Pension Committee to take sides.  Several of the individual defendants had been immersed in the negotiation and planning for the transaction.  Without the benefit provided by hindsight, they reasonably believed at the time that they already knew what they needed to know about both AES and IPALCO.  They did not have any persuasive reason at the time to view AES as a riskier investment than IPALCO. They knew that AES was a broadly held stock that could be sold by a Thrift Plan member on any business day.  And of course, the individual defendants did not control the investment of the vast majority of Thrift Plan assets.  The individual Thrift Plan members controlled the investment of all but the "new employer match" assets of the Plan.

Focusing on the character and aims of the Thrift Plan, the issue for the individual defendants was not whether the Plan should invest heavily in IPALCO, but only whether IPALCO stock, which would convert to AES stock, would remain a suitable option for plan participants to consider in making their own investment decisions.  On that issue, the Thrift Plan required that the option be available, and the Thrift Plan was designed to provide a vehicle for employees to invest in their employer's stock if they wished to do so.  The individual defendants also knew that they had provided a range of investment choices and appropriate individual investment advice to Thrift Plan members through Merrill Lynch.  See *Jenkins v. Yager*, 444 F.3d at 925-26 (affirming summary judgment for fiduciary who selected several conservative mutual funds as investment choices for participants in 401(k) plan, provided information on performance, and invited a financial

advisor to provide individual advice; issue was whether fiduciary had complied with his duties in his actions "delegating decision-making authority to plan participants"). Based on all the information known to the defendants, there was no compelling reason for them to undertake an additional inquiry into the suitability of IPALCO and then AES stock as an option available to plan participants in late 2000 and early 2001. In light of these circumstances, the court concludes that *Leigh v. Engle* and *Donovan v. Bierwirth* do not require a finding that the defendants in this case breached their fiduciary duties under ERISA.

Plaintiffs also rely on *Armstrong v. LaSalle Bank,* 446 F.3d 728 (7th Cir. 2006). That case involved another ESOP, but one for a company whose employees owned all the stock, so that there was no established market for the shares. Employees who retired or resigned were required to redeem their shares for cash based on a valuation done by an independent plan fiduciary. In one year, the fiduciary set a high value for the shares. The result was a wave of retirements and resignations to take advantage of the high price. To pay all that cash, the plan and company had to borrow large sums, which tended to de-stabilize both the plan and the company and caused the share price to plummet for the following years. Employees who stayed alleged that the plan fiduciary had breached its duty of prudence by setting too high a price for redemptions. The district court granted summary judgment for the defendant, and the Seventh Circuit reversed.

The Seventh Circuit recognized in *Armstrong* that the fiduciary was required not to set the share price too low, which would have been unfair to departing employees, so that it was important to review the fiduciary's decision deferentially. 446 F.3d at 733.  The Seventh Circuit found that the record did not show that the fiduciary had in fact exercised discretion based on the circumstances the company faced at the time, so reversal was required.  *Id.* at 734 (trustee who ignores changed circumstances that increase risk of loss to beneficiaries is imprudent).

In this case, plaintiffs have come forward with evidence indicating that the Pension Committee did not consider whether to prohibit further investment in IPALCO and then AES.  Plaintiffs argue that this evidence fits the standard of *Armstrong*, for discretion that was never exercised.  The court is not persuaded because the Pension Committee members, including Califar and especially chairman Tabler, were so familiar with AES and the planned transaction.  They concluded that the transaction was in the best interests of Thrift Plan participants when they decided to direct Merrill Lynch to vote shares in favor of the transaction in October 2000.  They had reasonable grounds for doing so.  The evidence shows that AES, at least without the benefit of hindsight, appeared to be a prudent investment option for Thrift Plan participants.

III.    *Wrongful Promotion and a Duty to Disclose*

Plaintiffs contend that defendant Hodowal wrongfully promoted continued investment in IPALCO and then AES when he spoke to shareholders at the

October 20, 2000 meeting and told them "the best is yet to come." Plaintiffs also contend that the defendants had a duty under ERISA to do a better job of disclosing to Thrift Plan participants more information about both the risks of investing in AES and the defendants' own sales of IPALCO and AES stock. Plaintiffs contend that information about the defendants' own choices about their personal investments – especially because of the broad and consistent pattern of sales – would have been material to plaintiffs in deciding how to manage their Thrift Plan accounts.

The wrongful promotion claim is not persuasive here. Hodowal supported the AES share exchange and had good reasons for doing so, independent of his own interests. A skeptical and reluctant IPALCO board had concluded that the transaction was the best option for IPALCO shareholders, including Thrift Plan participants. Hodowal and the board believed that a successful "strategic" buyer, one that would operate the business itself, would be the best for shareholders and employees. In terms of the claim of wrongful promotion, the Pension Committee had made significant efforts to educate Thrift Plan members about investment decisions, and in particular about the benefits of diversified investments. Neither Hodowal nor anyone else had any reason to expect the future drop in AES's stock price.

The disclosure claims require more detailed attention. The Supreme Court has held that an employer breaches its fiduciary obligation to plan participants

and beneficiaries by lying to them to induce them to surrender their benefits. *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 640 (7th Cir. 2004). The Seventh Circuit has found that fiduciaries breach their duty if they "mislead plan participants or misrepresent the terms or administration of a plan." *Vallone*, 375 F.3d at 640, quoting *Anweiler v. American Electric Power Service Corp.*, 3 F.3d 986, 991 (7th Cir. 1993). The court has found no deliberate deception in this case.

The *Vallone* opinion includes broad language indicating that only deliberate deception is actionable under ERISA, and that negligent or other unintentional failures to provide correct information to plan participants are not actionable as breaches of fiduciary duty. See *Vallone*, 375 F.3d at 642 ("while there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable"; "[t]hat is why the employer must have set out to disadvantage or deceive its employees, as in *Varity*, in order for a breach of fiduciary duty to be made out"), citing *Frahm*, 137 F.3d at 959-60. (ERISA has some specific information and notice requirements, and failures to comply with those requirements need not be deliberate.) At the same time, however, the Seventh Circuit has applied fiduciary standards under ERISA to the information that a plan administrator gives participants about their investment choices, without suggesting that plaintiffs must show deliberate deception. See *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (discussed below). The court does not rest its decision on this claim on the absence of deliberate deception.

Plaintiffs also rely on the following broad language from the Seventh Circuit in a different context under ERISA:

> Although not every error in communicating information regarding a plan will be found to violate a fiduciary's duty under ERISA, we have made clear that fiduciaries must communicate material facts affecting the interests of plan participants or beneficiaries and that this duty to communicate exists when a participant or beneficiary "asks fiduciaries for information, and even when he or she does not."

*Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000), quoted in *Vallone*, 375 F.3d at 640-41. Plaintiffs derive from this broad statement of fiduciary duty an obligation to provide Thrift Plan participants with any information that was material to their decisions about how to invest their accounts. Plaintiffs contend that a clearer explanation of the risks associated with investments in AES (something along the lines of Mr. Guy's presentation to the court) and a report on the defendants' sales of all or most of their own IPALCO shares would have been material to the plaintiffs' own investment decisions.

With the clarity that hindsight provides, that information seems to have been material, though there is no evidence that the IPALCO defendants' individual stock sales, which were all disclosed to the securities market, had any effect on the market's assessment of the value of either company's stock. Plaintiffs have attempted to bolster the theory with citations to numerous cases involving corporate insiders selling their stock based on inside information that is likely to lead to a drop in stock prices. *E.g.*, *In re System Software Associates, Inc.*, 2000 WL 283099, *13 (N.D. Ill. March 8, 2000) (denying motion to dismiss securities

fraud claims and recognizing that inference of fraudulent intent is strongest when several insider defendants engage in common pattern of unusual purchases or sales of stock); *In re Spyglass, Inc. Securities Litig.*, 1999 WL 543197, *6-7 (N.D. Ill. July 21, 1999) (denying motion to dismiss; plaintiffs' allegations of unusual pattern of stock sales by insiders supported inference of fraudulent intent), citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (reversing dismissal).  In such cases, unusual stock sales by true insiders can support an inference of intent to defraud other shareholders by providing false information to the market or by concealing negative information known only to insiders.

In this case, by contrast, plaintiffs invite the court to infer that the individual IPALCO executive-defendants must have known that AES would not be a good investment, that they then sold their own shares, and that they should have disclosed specifically to plaintiffs what they were doing for themselves and why.  On closer examination, this theory does not withstand scrutiny.

First, as a matter of fact, the individual IPALCO defendants had no material negative inside knowledge about AES and its prospects.  The only non-public information that turned up in the IPALCO due diligence examination of AES was that AES was exceeding analysts' expectations for revenues and earnings in the second quarter of 2000.  Plaintiffs' repeated references to the defendants as "insiders" therefore miss the point, which is whether the *IPALCO* executives had inside adverse information about *AES* that led them to sell.  They did not.

Second, plaintiffs' legal argument seeks to apply the Seventh Circuit's language about duties of disclosure to a very different context. In *Vallone*, the issue was whether an employer had breached ERISA fiduciary duties by offering an early retirement package with a promise of "lifetime" benefits for health care, and by then terminating the benefits some years later. The Seventh Circuit found no violation. 375 F.3d at 641. In *Anweiler*, the issue was whether plan fiduciaries breached their duties by persuading a participant to sign a reimbursement agreement but did not tell him that the agreement was revocable at will and that he was not required to sign it. The Seventh Circuit held that the fiduciaries' silence was a breach of fiduciary duty. 3 F.3d at 991-92. In *Bowerman*, the issue was whether a health plan administrator breached its fiduciary duty by providing incorrect information to a plan participant about how her exercise of the COBRA option for continued insurance would affect application of the pre-existing condition terms of the plan if the employer were to rehire her in the near future. The Seventh Circuit held that there was such a breach, especially where the summary plan description provided no information on the issue. 226 F.3d at 590-91. In *Frahm v. Equitable Life Assurance Society*, 137 F.3d 955, 959 (7th Cir. 1998), the issue was whether an employer's advice stressing the availability of "lifetime" health benefits without any qualifiers or reservations of a right to change or terminate benefits was a breach of fiduciary duty. The Seventh Circuit held it was not.

In these cases addressing fiduciary duties of disclosure under ERISA, the disclosures at issue all addressed directly the terms of the plans and benefits or the manner in which they were administered.  This case presents a different set of issues addressing the Thrift Plan participants' own decisions about how to invest their individual accounts.  In this case, the participants did not need information about their health benefits or disability benefits, or about how to apply for distribution of their accounts, or how to change their beneficiary designation.  Instead, the Thrift Plan participants were investors and shareholders in a publicly traded corporation.

Much more illuminating in this context is *Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006).  There the Seventh Circuit applied these more general principles regarding ERISA fiduciaries' duty of disclosure regarding the information a 401(k) plan provided to participants for making their investment decisions.  In *Jenkins*, the 401(k) plan allowed participants to direct their investments among several different mutual funds.  The available mutual funds produced disappointing returns, and a participant sued the fiduciary.  She claimed that the fiduciary breached his duty by failing to monitor the chosen mutual funds, by failing to review each participant's investment decisions, and by failing to provide the participants with adequate information to make their own investment decisions.

The Seventh Circuit affirmed summary judgment for the defendant fiduciary on these claims.  The undisputed facts showed that the fiduciary arranged an

informational meeting each year where an outside adviser discussed the funds'
performances and outlook.  The fiduciary also distributed materials on fund
performance.  The written information about investment choices was also left in
the company break room available to all employees.  444 F.3d at 926.  The
Seventh Circuit found that these facts defeated any claim that the fiduciary failed
to provide adequate information, and also noted that the plan administrator was
not required "to investigate each participant's circumstances and prepare advisory
opinions for literally thousands of employees."  *Id.*, quoting *Bowerman v. Wal-Mart
Stores, Inc.*, 226 F.3d 574, 590-91 (7th Cir. 2000), citing in turn *Chojnacki v.
Georgia-Pacific Corp.*, 108 F.3d 810, 817-18 (7th Cir. 1997).

The information that defendants provided to the Thrift Plan participants in
this case easily satisfies and exceeds the standards of *Jenkins v. Yager.*  The
Merrill Lynch meetings, brochures, and available investment advice gave the
IPALCO Thrift Plan participants ample information to make their own decisions
about how to invest their accounts.  Unlike the plan in *Jenkins*, which allowed
shifts among investment options only once each year, the IPALCO Thrift Plan
allowed daily shifts of investments.

Nevertheless, this case is arguably different from *Jenkins v. Yager* because
of the central role of the AES acquisition.  The court assumes for purposes of
argument that the *Jenkins* standard for disclosure to inform participants about
their choices might be too low in the face of a major corporate transaction

affecting the employer's own stock.  (The *Jenkins* plan did not involve stock of the employer.)  As applied to the AES acquisition, however, adopting plaintiffs' theory of inadequate disclosure would create a sharp tension between ERISA and federal securities laws.  As applied to information about AES, plaintiffs' theory that ERISA required the fiduciaries to provide some special form of disclosure to ERISA beneficiaries would conflict with the principles of full public disclosure of material information to *all* shareholders reflected in federal securities laws.  In addition, the court is not persuaded that ERISA requires plan fiduciaries for EIAPs to disclose more to participants about the fiduciaries' own personal financial decisions than is required under federal securities laws.

Plaintiffs do not contend that defendants failed to comply with federal securities laws in any respect.  Plaintiffs do not claim that the proxy statement provided to plaintiffs and all other IPALCO shareholders was misleading or otherwise inadequate under federal securities law in its disclosure of information about AES or risks associated with its stock.  Plaintiffs also do not claim that the individual defendants failed to disclose their sales of IPALCO stock and stock options as required under federal securities law.  What should defendants have done, according to plaintiffs?

Plaintiffs' answer to the question is not specific.  See Pl. Reply Br. at 16-17 (Docket No. 65).  They seem to have in mind some sort of special disclosures directed to all Thrift Plan participants individually – one disclosure with a different

statement about risks of the AES share exchange, and another disclosure (or perhaps many others) about the personal investment decisions of persons with fiduciary duties for the Plan.  Under plaintiffs' theory, the defendants, who were all insiders with respect to IPALCO, had a duty to give special information to the plaintiffs that they were not obliged to give other IPALCO shareholders.

This prospect of different levels of disclosure requirements for different shareholders is difficult to reconcile with the principles of public disclosure that are the foundation for federal securities laws.  In effect, plaintiffs are arguing that the IPALCO insiders had a fiduciary duty under ERISA to provide these plaintiffs with information that they did not provide to other shareholders, giving the plaintiffs a special status and special rights in making their investment decisions. See *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1098 n.4 (9th Cir. 2004) (noting that *Moench* standard for disposing of employer stock "seems problematic to the extent that it inadvertently encourages corporate officers to utilize inside information for the exclusive benefit of the corporation and its employees.  Such activities could potentially run afoul of the federal securities laws.").

Several of the defendants (at least Hodowal, Humke, and Tabler) were responsible for distributing the detailed proxy statement to all IPALCO shareholders.  That proxy statement provided extensive background information about AES and its stock, including its recent price history, which showed more volatility and more growth than IPALCO stock.  The proxy statement made clear

-101-

that AES did not pay dividends.  The proxy statement also included positive information about AES.  For present purposes, the most important thing is that plaintiffs have not identified any false information in the proxy statement, or any information that was even misleading, whether by express statement or by omission.  That proxy statement was the document that federal securities law required to ensure that shareholders have the material information they needed to make decisions.

Mr. Guy criticized the proxy statement for providing *too much* information.  Tr. 381 ("This is a case where too much disclosure is no disclosure.  I had trouble reading it.").[16]  Yes, the proxy statement provided a lot of detailed information in fine print, as is the practice in modern securities disclosures.  That is what was required to ensure compliance with federal securities laws.  With the benefit of hindsight, it is now possible to wish that certain facts had been highlighted more specifically.  But it is also easy to imagine that a proxy statement that stressed much more heavily the risks of AES stock would have convinced more IPALCO shareholders to sell their shares.  If AES stock had then later risen sharply instead of falling sharply, those shareholders would be arguing that the proxy statement was too negative and cautious.

---

[16]Mr. Guy's expertise does not extend to federal securities law and its disclosure requirements in the context of transactions like the AES-IPALCO share exchange.

Similarly, the IPALCO insiders properly and timely reported to the SEC all of their sales of IPALCO stock, including the exercises of stock options. Their disclosures were published in the business press and even in the daily newspaper in Indianapolis.

Plaintiffs point out that they did not see the disclosures defendants made of their own sales of IPALCO stock before the closing. That does not matter. Modern securities law is built upon the assumption of efficient capital markets, at least for publicly traded corporations. In a securities fraud case, for example, a person who bought or sold stock is not required to show that she read the defendant's fraudulent disclosure to the market. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). The courts presume that fraudulent information is considered by other investors and analysts and that the information is therefore built into the current market price. Investors therefore may rely on the market price to be a fair one that reflects the available public information. *Id.*; *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (fraud-on-the-market theory assumes that news is promptly incorporated into stock price); see also *Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) (for purposes of applying statute of limitations, a reasonable investor is presumed to have information available in public domain). Also, there is no evidence that the complete and lawful disclosure of the IPALCO insider sales had any effect on the price of either IPALCO or AES stock. Nevertheless, plaintiffs again contend that

they were entitled to some form of special disclosure that would not have been provided to other shareholders.

ERISA should not be interpreted to give some shareholders, those in ERISA plans, special access to information not presented to other shareholders in the publicly traded corporation.  See *Wright v. Oregon Metallurgical Corp.*, 360 F.3d at 1098 n.4 (noting risk that ERISA could run afoul of federal securities law if it were interpreted to give employees a right to special information for purpose of trading stock); see generally *Baker v. Kingsley*, 387 F.3d 649, 662 (7th Cir. 2004) ("if we were to create a new fiduciary duty [to disclose likelihood of employer's bankruptcy and plan termination], as plaintiffs request, we run the risk of disturbing the carefully delineated corporate disclosure laws").

The duty plaintiffs seek to impose on plan fiduciaries to disclose their personal transactions is also very vague in terms of who would need to disclose what information to whom, when, and how.  In such a scheme, the devil is in the details.   Despite its many detailed disclosure requirements, ERISA has no requirements specifically for disclosures of this sort. The SEC has established one set of detailed rules for corporate insiders to report their transactions to the SEC, by which they become public information.   See 15 U.S.C. § 78p; 17 C.F.R. § 240.16a-1 *et seq.*  Federal judges and other federal officials are familiar with another financial disclosure regime, see 5 U.S.C. App. § 101 *et seq.*, which requires them to provide particular types of detailed information once each year.

Without well-defined obligations for such disclosure, the temptation will be powerful for  investors who lost money, and perhaps even for judges who decide their cases, to use hindsight to decide whether more information should have been disclosed sooner, more clearly, and more personally to the plaintiffs.  Along these lines, it is important to remember that ERISA is a compromise between competing concerns.  The law was written to protect employees' interests, but without creating a system that would be so complex or burdensome as to discourage employers from even offering benefit plans.  See *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).  Adopting plaintiffs' disclosure theory would add substantially to the risks and burdens of operating a plan like the Thrift Plan.

To sum up on this disclosure issue, the court concludes that the defendants, who appear to have complied fully with federal securities law in disclosing information about AES and about their own transactions in IPALCO stock, did not breach any fiduciary duty under ERISA by failing to provide additional or more specific information about those subjects to the Thrift Plan participants.

IV.    *Conversion of the Employer Match*

Plaintiffs' final claim is that the defendants breached their fiduciary duties under ERISA by allowing the "new employer match" invested in IPALCO stock to convert to AES stock.  This claim concerns a modest fraction of the Thrift Plan assets, only about six percent, but still $13.8 million as of March 27, 2001.  Ex.

1012. The issues on this claim are different because the plan participants did not have any ability to choose how the new employer match should be invested on their behalf.

The threshold issue on this claim is whether the defendants undertook any fiduciary act at all. ERISA allows an employer who establishes a benefit plan to decide the benefits that will be provided and to impose limits on those benefits. Just as the settlor of a trust is entitled to choose the terms of the trust, and may do so without undertaking any fiduciary duties to trust beneficiaries, so an employer may choose to provide benefits in a certain way, subject only to broad limits imposed by ERISA. See *Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir. 1995) (explaining this aspect of ERISA in terms of trust law). As the plan sponsor, IPALCO was under no obligation to provide any match at all for employee contributions. The original requirement that the employer matching contributions be invested only in IPALCO stock was simply a design feature of the plan that was left to the sponsoring employer's discretion. See, *e.g.*, *Akers*, 71 F.3d at 231 (affirming summary judgment; employer did not violate ERISA fiduciary duties by purchasing all shares of stock in company at less than market value, and then funding benefit plan with shares of stock valued at market value, or by deciding to terminate plan and sell stock at market value); see also *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000) (affirming summary judgment; employer did not act as fiduciary when setting up benefit plan; defined functions of fiduciary do not include plan design, amendment, or termination);

*Ames v. American National Can Co.*, 170 F.3d 751, 757 (7th Cir. 1999) (affirming summary judgment; employer did not act as fiduciary when making design changes to benefit plan in connection with transfer of control of business).

Defendants have argued that the Plan amendment signed by Hodowal on January 16, 2001 was merely a ministerial act, not a fiduciary act, because the approval of the share exchange plan meant that all existing shares of IPALCO stock would be converted by operation of Indiana law into shares of AES stock (using the final exchange ratio). Plaintiffs argue that it was a fiduciary act subject to the fiduciary duties imposed by ERISA. In the court's view, IPALCO and Hodowal did exercise fiduciary power over the IPALCO shares held by the Thrift Plan as "employer match" shares. They exercised this power regardless of whether the January 16th plan amendment was adopted.

IPALCO itself was exercising authority and control over existing plan assets by entering into the AES transaction and then amending the Thrift Plan so as to require conversion of the existing IPALCO stock to AES stock, without allowing the Pension Committee discretion to take other action regarding the IPALCO stock. Such authority and control imply that IPALCO itself was undertaking a fiduciary role under ERISA. See 29 U.S.C. § 1002(21)(A)(i) (a person is a fiduciary with respect to a plan to the extent she "exercises any authority or control respecting management or disposition of its assets"); *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.*, 698 F.2d 320, 327 (7th Cir. 1982) (plan

administrator was fiduciary under this definition); see also *Wolin v. Smith Barney Inc.*, 83 F.3d 847, 849 (7th Cir. 1996) (broker was fiduciary under ERISA where he rendered advice to plan administrators pursuant to an agreement, was paid for the advice, and had "influence approaching control over the plan's investment decisions"), disapproved on other grounds, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997).

This reasoning would not apply to a decision to make or to continue making new employer contributions in the form of employer stock, which would remain a matter of plan design. But this reasoning applies to the management or control of the *existing* assets at the time of the AES transaction. See *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 724 (7th Cir. 2000) (treating plan amendment as plan sponsor's non-fiduciary action not subject to fiduciary standards, but treating decision about investment of existing plan assets as subject to ERISA fiduciary standards); *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 959-60 (N.D. Ohio 1998), *aff'd sub nom. Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir. 2002) (holding that an ESOP's purchase of stock at inflated prices with cash already transferred to the ESOP was an action involving management of assets and was subject to fiduciary standards; rejecting the argument that the purchase was only the act of a plan sponsor). Those existing Plan assets held in the form of IPALCO stock had already generated tax benefits for IPALCO. Thrift Plan participants and beneficiaries already had vested interests in those assets. Thus, as applied to the decision to convert IPALCO stock held in the Thrift Plan

into AES stock while amending the Thrift Plan to prohibit the Committee from taking any other action with respect to the existing IPALCO stock, IPALCO and defendant Hodowal were subject to ERISA's fiduciary standards.[17]

The court does not mean to suggest that IPALCO acted as an ERISA fiduciary in deciding to enter into the AES transaction.  Nor does the court mean to suggest that ERISA fiduciary duties apply to corporate business decisions that have foreseeable effects on the price of stock held by an ERISA plan.  But by structuring the AES deal as a share exchange, the corporate strategic decision had the direct effect of transforming existing ERISA plan assets from investments in IPALCO to investments in AES.

When IPALCO entered into the agreement with AES, IPALCO amended the Thrift Plan so as to convert all of the employer-match contributions of IPALCO stock to AES stock.  The result was not different in practical effect from a decision by IPALCO to order the Pension Committee to sell all such IPALCO stock and to invest in some other company specified by IPALCO.  The "plan design" cases do not require that such a decision to change existing plan investments be treated

---

[17]The Seventh Circuit has written broadly that "the defined functions of a fiduciary do not include plan design, the amendment of a plan, or the termination of a plan."  *E.g.*, *King v. National Human Resource Committee, Inc.*, 218 F.3d at 723. That broad statement does not apply, however, to a plan amendment that has the effect of dictating a change in the way *existing* plan assets must be invested.

as a matter of plan design that is left to the complete discretion of the plan sponsor.

Although IPALCO and Hodowal were subject to ERISA fiduciary requirements, the court concludes that plaintiffs have failed to prove a breach of those duties in the conversion of the new employer match.  For all the reasons explained above, between July 15, 2000 and March 27, 2001, AES appeared to be a prudent and reasonable investment, and a stronger investment than an independent IPALCO would have been.  The issue for the new employer match was not whether AES should merely be an option for participants.  IPALCO controlled the form of the new employer match assets.  But the basic plan design was to make and hold employer matching contributions in the form of employer stock.  That plan feature served the purpose of giving employees a personal investment in their employer.  Allowing the conversion of existing IPALCO stock to AES stock was consistent with that basic design and purpose of the Thrift Plan.  IPALCO, Hodowal, and the other defendants had no reason to believe that AES stock would not be a reasonable and prudent investment consistent with that design and purpose.  The court finds no breach of ERISA fiduciary duties in the conversion of the new employer match from IPALCO to AES stock on March 27, 2001.

*Conclusion*

Defendants are entitled to judgment in their favor on the plaintiffs' claims of breach of fiduciary duty under ERISA.   Final judgment shall be entered accordingly.


So ordered.

Date: March 28, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com

Dane Hal Butswinkas
WILLIAMS & CONNOLLY LLP
dbutswinkas@wc.com

James H. Ham, III
BAKER & DANIELS
jhham@bakerd.com

Catherine A. Meeker
BAKER & DANIELS
cameeker@bakerd.com

Vidya Atre Mirmira
WILLIAMS & CONNOLLY
vmirmira@wc.com

John Andrew Ploumitsakos
WILLIAMS & CONNOLLY LLP
jploumitsakos@wc.com

John R. Price
JOHN R PRICE & ASSOCIATES
john@johnpricelaw.com

John W. Purcell
BAKER & DANIELS
john.purcell@bakerd.com

Nicholas Styant-Browne
HAGENS BERMAN, LLP
nick@hagens-berman.com

Andrew M. Volk
HAGENS BERMAN SOBOL SHAPIRO LLP
andrew@hbsslaw.com

Tyler Stuart Weaver
HAGENS BERMAN SOBOL SHAPIRO LLP
tyler@hbsslaw.com

R. Hackney Wiegmann
WILLIAMS & CONNOLLY LLP
hwiegmann@wc.com

Paul A. Wolfla
BAKER & DANIELS
paul.wolfla@bakerd.com